[No. 39899.    Department Two.    July 31, 1969.]

Tʜᴇ Sᴛᴀᴛᴇ ᴏғ Wᴀsʜɪɴɢᴛᴏɴ, *Respondent,* v. Jᴀᴍᴇs Eʟʏ Gᴇғᴇʟʟᴇʀ, *Appellant.**

*Kempton, Savage & Gossard,* by *Anthony Savage, Jr.,* for appellant.

*Reported in 458 P.2d 17.

*Charles O. Carroll* and *Laurence A. Mosler,* for respondent.

HALE, J.—If Nancy Williams had not been awakened at 3:20 in the morning by a noise from across the street, the chances are the defendant would not have been convicted of burglary. The Williamses lived in a second-floor apartment on North Greenwood Avenue in Seattle opposite the 68th Street Tavern. In the early morning hours of February 21, 1967, they were asleep in the front bedroom when, as Mrs. Williams testified:

> [W]e were sleeping and I was awakened by a ripping noise. It was something unusual that woke me up because our bedroom is on the front of our house, and I looked out the window and I saw a man breaking into the front door of the tavern and I looked long enough to see what was going on and then I went and called the police.

Greenwood, she said, is a 4-lane, well-lighted street; she looked out the window for 15 or 20 seconds and had a good look at the defendant. He appeared to be prying open the front door of the tavern.

While the defendant was inside the tavern, she actually saw his face. She described his apparel as "light cream-colored pants that looked like denims and a green jacket and hat." The jacket, she said, was of waist length, and the short-brimmed hat he was wearing did not cover his face. This description was corroborated by others who had seen the defendant earlier that night. Interior lighting of the tavern gave her good visibility, she said. When she telephoned the police, it awakened her husband. He got up, looked out the window at the tavern, got a pistol and went downstairs. A few minutes later she heard the sound of shots.

Paul Williams, her husband, testified that he was awakened that morning about 3:20 by his wife, and she told him someone was breaking into Bob's tavern—the 68th Street Tavern—across the street. He looked out his bedroom window at the tavern. He had a very good view, he said,

because his windows were 15 or 20 feet above the ground. At first he saw only shadows in the tavern and then a man inside it. He stated he got a good look at the defendant in front of the tavern because there was a yellow lantern at the end of the bar, and defendant walked between the window and that light. Mr. Williams got his gun, ran downstairs, and, seeing what he thought was a second man running alongside the tavern, took up a position next to his own building, all the while watching across the street. He said he did not want to see "Bob's tavern get robbed," so he fired a shot at the front door "just to get them out of there," and then fired another shot. The police were there within 3 or 4 minutes.

Both Mr. and Mrs. Williams testified that the defendant in court was the man they recognized as the man in and near the tavern that early morning of February 21, 1967. They identified him for the police the next morning from a solitary police photograph and at a lineup on the same day at the police station as the same man they had seen that early morning near and inside the tavern.

When the police arrived, they found the front door of the tavern open, its lock forced, the door casing broken and the rear door standing open. Another team of officers investigating the area found a 1966 Chevrolet convertible automobile one half block from the tavern, parked 2½ feet from the curb, faced the wrong way, with its motor warm and one door ajar. The car proved to be licensed in the defendant's name as registered owner. Examination of the car showed that it had not been hot-wired or apparently tampered with. The police impounded it. Next day, when defendant went to the police station to report that his car had been stolen and to have it released, he was placed under arrest. Defendant did not testify but sought to prove an alibi through others.

He appeals his conviction of burglary, urging three assignments of error, the first of which covers both the use of a single police identification picture and evidence of a police lineup or showup. After the burglary and before

seeing either the police photograph or lineup, the Williamses had given the police a clear description of the burglar and his apparel. Later that morning, a Seattle detective in interviewing them showed them a police photograph of the defendant, and both said that he was the man they had seen in the tavern. How or why the police happened to have the defendant's picture is not made clear in the record. Neither witness had any hesitancy or self-doubt in identifying defendant from the picture either in a police lineup or in court as the man they had seen in the commission of a burglary. The identification by photograph thus falls within the rationale of *Simmons v. United States,* 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968), at 384:

> Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs. The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error. We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. This standard accords with our resolution of a similar issue in *Stovall v. Denno,* 388 U.S. 293, 301-302, and with decisions of other courts on the question of identification by photograph.

Showing the two witnesses a picture of the accused soon after the commission of the crime which they had witnessed was not, we think, "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States, supra.* Both

witnesses testified that their identification of the defendant at the lineup and at trial had not been affected or influenced by seeing the photograph. To hold otherwise as a matter of law would amount to an errant, argumentative judicial assumption of fact. The sight of a picture showing part or all of a clearly seen event soon after its occurrence without more cannot be said as a matter of law to induce such a suggestion in the mind of a witness as to render inadmissible his testimony concerning identity of the person in the picture. Whatever normal uncertainties may be claimed to have inhered in seeing the picture could well be disclosed by cross-examination. The state should not be deprived of this identification merely because the police had shown the two witnesses only a solitary picture. *State v. Kearney,* 75 Wn.2d 168, 449 P.2d 400 (1969).

At the police station, defendant acceded to the request of the police that he appear in a lineup or, as it is sometimes called, a showup. He does not urge compulsion nor ignorance of his rights, privileges or immunities, nor that the officers failed to adequately advise him, but claims that the lineup was so suggestive and conducive to misidentification as to amount to a denial of due process of law under the fifth and fourteenth amendments to the United States Constitution.

The officers testified that defendant agreed to stand in a showup and, acting on this agreement, they arranged to hold it about 2:30 in the afternoon of the day of the burglary. Five men, who the officers testified resembled the defendant as closely as they could find, were brought down from the jail. Of the six men in the lineup, defendant was the only one wearing a trench coat, so he asked to remove it, which request was allowed. He was given his choice of positions in the line and he picked number one. Mr. and Mrs. Williams both positively identified defendant in the lineup as the man they had seen near and inside the tavern that early morning.

Defendant contends the evidence of the lineup was inadmissible, as we understand his argument, because the

showup or lineup as conducted was so suggestive and gave such an emphasis to the testimony of the two witnesses who identified him as to amount to a denial of due process of law under the principles asserted in *United States v. Wade*, 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926 (1967); *Stovall v. Denno*, 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967 (1967).

■ The argument is ingenious but we think without substance. To say that in a great many criminal cases conviction depends on identifying the accused and establishing his presence at the scene of the crime states but a truism. Consequently, evidence going to the accused's identity and showing that he was present and committed the acts charged was relevant, material and admissible. Nothing in the record before us suggests that the police rigged the showup or sought to render defendant unduly conspicuous in it, or did anything in connection with it to make it so "suggestive as to give rise to a very substantial likelihood of irreparable misidentification," or otherwise render it inadmissible. *Simmons v. United States, supra; State v. Hicks*, 76 Wn.2d 80, 455 P.2d 943 (1969). Evidence of the lineup was, therefore, properly received.

Defendant claims error in admission of a police detective's testimony that the defendant had taken a lie detector test, and that the results of it had been inconclusive. But whatever view the courts may hold generally on the subject of lie detectors, the evidence challenged here can hardly be declared error because the matter of a lie detector test was first introduced by defendant on cross-examination.

At the conclusion of a police officer's direct examination, defendant, on cross-examination, asked the officer if the defendant had taken a lie detector test and if he had been cooperative. Receiving affirmative answers, defense counsel then asked about the results of the test. To this, the officer answered, "It was an inconclusive examination." On redirect, the prosecution asked the witness to explain what he meant by inconclusive results, and the defendant then, on

recross-examination, explored the officer's experience and education concerning the subject of polygraph examinations.

■ Defendant thus opened the door to the testimony concerning lie detector tests by first asking whether one had been given and whether the defendant had been cooperative concerning it. The officer's answers were neither volunteered nor unresponsive. Defendant then dropped the subject with the testimony that the tests had been inconclusive. It would be a curious rule of evidence which allowed one party to bring up a subject, drop it at a point where it might appear advantageous to him, and then bar the other party from all further inquiries about it. Rules of evidence are designed to aid in establishing the truth. To close the door after receiving only a part of the evidence not only leaves the matter suspended in air at a point markedly advantageous to the party who opened the door, but might well limit the proof to half-truths. Thus, it is a sound general rule that, when a party opens up a subject of inquiry on direct or cross-examination, he contemplates that the rules will permit cross-examination or redirect examination, as the case may be, within the scope of the examination in which the subject matter was first introduced. *State v. Stevens,* 69 Wn.2d 906, 421 P.2d 360 (1966); *State v. Hunter,* 183 Wash. 143, 48 P.2d 262 (1935); *State v. Ward,* 144 Wash. 337, 258 P. 22 (1927); *State v. Hempke,* 121 Wash. 226, 209 P. 10 (1922); *State v. Anderson,* 20 Wash. 193, 55 P. 39 (1898).

Defendant, citing *State v. Emmanuel,* 42 Wn.2d 1, 253 P.2d 386 (1953), directs his third assignment of error to the prosecution's attempt on cross-examination to impeach defendant's wife who had testified on direct as to an alibi and possession of the keys to their automobile. In essence, the assignment urges that it was misconduct of counsel and prejudicial error to ask on cross-examination some five questions of an impeaching nature concerning her conversations with a police officer relating to the car keys, without later offering proof that such conversation actually occurred. In her answers to the five questions, the witness

denied that she had discussed with her husband getting their "stories straight with reference to the car keys."

On rebuttal, the state introduced impeaching testimony which may well have made the questions under attack admissible, but we need not assess that aspect of the question for the claim of error urged now was not urged at trial nor otherwise preserved in the record. Unless the misconduct claimed or error assigned is of such an inflammatory or persistently prejudicial nature as to be incurable by instruction or admonitions from the court, it will not be considered error on review unless claimed as error at trial and corrective measures requested.

The trial court must be given an opportunity to rule on the asserted error and to correct it during trial or it will not be held error on appeal. *State v. Miller,* 66 Wn.2d 535, 403 P.2d 884 (1965). Throughout the entire cross-examination of defendant's wife concerning the keys to their car and her conversations with her husband and the police officers, the record shows that no objections were interposed, instructions or admonitions requested, or motions to strike made, nor were any curative instructions on the point in issue requested of the court. The trial record thus discloses no claim of error whatever made or presented to the trial court on this assignment of error.

In the absence of misconduct or error of such extremely flagrant and prejudicial nature as to make all curative measures obviously futile, or unless there has been so persistently prejudicial a course of conduct that the record shows the trial to have been so unfair as to constitute a denial of due process of law, the errors assigned must be claimed at trial. To be reversible error on appeal, it must be claimed error at trial. *State v. Morphis,* 64 Wn.2d 260, 391 P.2d 212 (1964); *State v. Green,* 70 Wn.2d 955, 425 P.2d 913 (1967); *State v. Miller, supra.*

Affirmed.

HUNTER, C. J., ROSELLINI and NEILL, JJ., and DONWORTH, J. Pro Tem., concur.