# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71128-8-I |
|  | ) |  |
| Respondent, | ) | DIVISION ONE |
| v. | ) |  |
|  | ) |  |
| ROOSEVELT REED, | ) | UNPUBLISHED |
|  | ) |  |
| Appellant. | ) | FILED: June 1, 2015 |
|  | ) |  |

Cox, J. – Roosevelt Reed's severely beaten girlfriend lay bleeding and semi-conscious on the floor of their residence for 33 minutes before Reed finally called 911. During that half hour, Reed made multiple phone calls to his brother and a friend and even checked his voice messages. Although he claimed he told his brother during one call "that someone . . . almost killed the b-i-t-c-h," his brother and sister-in-law heard him say "I think *I* killed the bitch."[1] Reed also admitted the assault to his daughter. A jury rejected Reed's claim that the perpetrator was an unknown intruder and convicted him of first degree assault. He appeals, arguing that an evidentiary error and ineffective assistance of counsel require a new trial. The court did not abuse its discretion in admitting the challenged evidence. And given the strength of the State's case, there is no reasonable probability that any evidentiary error or deficient performance by defense counsel affected the verdict. We affirm.

---

[1] (Emphasis added.)

Based on allegations that Reed assaulted and severely injured his girlfriend, J.G., the State charged him with first degree assault. The State alleged the assault was a crime of domestic violence, was committed shortly after Reed's release from prison, and was part of an ongoing pattern of abuse.

At trial, J.G. testified that she started dating Reed in the 1980s. They "were into drugs a lot."[2] When J.G. became pregnant, she left Reed because she "didn't want to be on drugs" during her pregnancy.[3] She later gave birth to a daughter, H.D. Reed is H.D.'s father.

J.G. did not see Reed again until 2008. A friend in prison told her that an inmate, Roosevelt Reed, wanted to speak to her. J.G. and H.D. started talking to Reed by phone and visiting him in prison.

In April 2012, Reed was released from prison and moved in with J.G. in Des Moines. Although they initially had only minor arguments, Reed became increasingly aggressive. He slapped J.G. on one occasion and would say things like "don't take me to that dark place . . . I have this dark place and you don't need to take me there."[4] J.G. knew that Reed had been in prison for "hitting his girlfriend in the head with a brick," and that he "broke the windshield out on some girl that used to be with him." Reed also told her "how he would beat her up" H.D.'s half-sister's mother.[5]

---

[2] Report of Proceedings (Sept. 17, 2013) at 63.
[3] Id.
[4] Report of Proceedings (Sept. 18, 2013) at 82.
[5] Report of Proceedings (Sept. 17, 2013) at 82.

In early September 2012, J.G. and Reed visited H.D. in Spokane. H.D. testified that Reed was controlling toward J.G., became angry over small things, and called her a "bitch." When Reed asked H.D. for help with his phone, she saw that he had been exchanging text messages with another woman. Later, as they were driving home from Spokane, Reed told J.G. that the messages were about a girl that he had "beat up" years ago. J.G. said the assault was not funny and that was why he went to jail. Reed became angry so J.G. pulled the car off the freeway. Reed then took the keys, drove off, and left her on the side of the road. When J.G. called him and threatened to call the police, Reed returned and drove them home.

The incident at issue in this case occurred the next day. Reed testified that he had lunch that day with his friend Joe Kelley, who then drove him to his appointment with his Community Corrections Officer (CCO), Stacy Westberg. Kelley generally corroborated Reed's testimony. On cross-examination, Kelley conceded that he had refused to talk to a detective on the advice of Reed's lawyer. Kelley was also confused about the timing of events on the day of the assault and did not remember calling or receiving calls from Reed shortly after the assault. J.G. also had difficulty recalling events on the day of the assault and testified that she accompanied Reed to his DOC appointment. Cell phone records, however, suggested that she remained home during that time.

CCO Westberg testified that Reed seemed fine during his appointment until she told him that J.G. could no longer pick up his travel permits and that he had to pick them up himself. Reed became angry and left the office at approximately 4:05 p.m.

J.G. testified that when Reed arrived home they argued, possibly about money. Reed pushed her and she pushed him back. When she reminded him of their agreement not to fight anymore, he pushed her "really hard" into a wall. She then grabbed the gold chain necklace he was wearing and blacked out.

Reed denied arguing with J.G. or assaulting her. He claimed he arrived home and found her lying on the floor. Although she was semi-conscious, bleeding, and so swollen she was unable to talk, Reed did not call 911 because "I wanted to do my own investigation, because I took that personal."[6] He testified that he administered first aid, putting ice on her for the swelling and getting rags and clothing for her wounds. He eventually told her she needed medical attention, but she said "no." Reed testified that he couldn't "force that."

At 4:34 p.m., Reed made the first of a series of phone calls to his brother, Precious Reed, and to Joe Kelley. He called Precious at 4:34 p.m., 4:36 p.m., 4:38 p.m. and 4:39 p.m. He received calls from Precious at 4:37 p.m. and 4:39 p.m. He called his own voicemail and Joe Kelley at 4:37 p.m. He received a call from Joe Kelley at 4:40 p.m., and a call from Shantell Reed's cell phone at 4:57

---

[6] Report of Proceedings (Sept. 26, 2013) at 342.

p.m. Reed did not call 911 until 5:07 p.m., over 30 minutes after his initial call to his brother.

Reed testified that during one of the calls to Precious, he said "man, somebody came in my house and almost killed the b-i-t-c-h."[7] He explained that "b-i-t-c-h" was not derogatory and "can be considered honorable . . . in the African American language."[8] The prosecutor explored this topic further on cross-examination:

> Q. But I just want to get this straight. When you think she's actually dying on the floor, you call your brother and said – you called her a bitch then?
> A. Yes.
> Q. When she's laying there, like half dead, on the floor, you're saying, I think someone killed the bitch; right?
> A. My.
> Q. My bitch? Your bitch? She's your bitch; right?
> A. (Witness nods head affirmatively.)[9]

Precious's wife, Shantel Smith-Reed, testified that she overheard Reed's call to Precious. According to Shantel, Reed said "I need you to get over here" and "I think I killed the bitch."[10]

Detective Fred Gendreau of the Des Moines Police Department testified that he recorded a phone conversation with Precious. On the recording, Precious says Reed called him and said "come over here and get the car; I think

---

[7] Id. at 339.
[8] Id. at 341.
[9] Id. at 393.
[10] Report of Proceedings (Sept. 23, 2013) at 6 (emphasis added).

I killed her."[11] Precious later said the same thing when Detective Gendreau served him with a subpoena. Precious also said that "what [Reed] did was wrong" and that Reed had an anger problem. During his testimony, Precious reluctantly admitted making the statement in the recorded phone conversation but repeatedly noted that he was using drugs at the time.

Officer Kevin Montgomery of the Des Moines Police Department testified that he arrived at the assault scene at 5:14 p.m. Reed told him he found J.G. lying in the doorway when he got home. Reed told Precious that same day that "somebody kicked the door open."[12] Police, however, found no signs of a break-in or missing property.

Officer Montgomery asked Reed if he could account for the time between his departure from the DOC office and his 911 call. Reed said he had "gone to a friend's house to pick up his vehicle."[13] Reed admitted during cross-examination, however, that he told his CCO that he left their meeting and went straight home.

Officer Anthony Nowacki testified that he tried to talk to J.G. at the scene, but she could not open her eyes or mouth and responded to questions with mumbles and groans. Because they could not communicate with J.G., the police did not arrest Reed at that time.

An ambulance took J.G. and Reed to a hospital where J.G. was treated for multiple facial fractures. She testified that doctors told her she would have been

---

[11] Report of Proceedings (Sept. 25, 2013) at 245.
[12] Id. at 205.
[13] Report of Proceedings (Sept. 17, 2013) at 25.

killed if she had been hit one or two more times. She described the long-term

effects of her injuries, stating:

> I can't feel any of my face. I can't feel – I can feel from this part of my lip over. And so like if I drink coffee, I have to put my tongue to it because my lip doesn't have any feeling. And when I talk, my lip doesn't move. It just feels like it has a piece of hard plastic or something in it. It doesn't move.
>
> And as the day wears on, my eye closes down more and more. As far as pain, anytime I lay down, I have migraines, so I'm on morphine for that . . . .
>
> I don't know how many plates they have in my face, but I know there's little circles of plates. And I have plates up here. This whole part of my face right here was broke out, so there's plates connecting everything here.
>
> And my jaw was broke up like this. I can't chew any food on this side of my mouth because it feels like I'm chewing nothing because I can't do it. So if I eat the food, sometimes it will get caught up in my lip. I have to clean up. I drink water that has a spout on it. If I drink it on this side of my mouth, it runs out of my mouth.
>
> . . .
>
> . . . Usually you have a bone that hooks up into your cheekbone and everything. I'm missing all this bone. It's all metal from under my eye.[14]

An emergency room social worker, Margaret Lake, testified that when

Reed approached J.G. in her hospital room, J.G. immediately pulled away from

him. Reed angrily told her to calm down. Lake said this was "a real unusual

response for a family member."[15]

The day after the assault, Detective Gendreau called J.G. and Reed

answered the phone. Detective Gendreau identified himself as a police detective

---

[14] Id. at 89-90.
[15] Report of Proceedings (Sept. 18, 2013) at 121.

and asked to speak to J.G. Reed asked "why [he] was calling."[16] Detective Gendreau thought Reed's question was suspicious given that J.G. had just been the victim of a serious assault.

J.G. told several different stories about the assault. She told several people she was attacked by an unknown person in her doorway. She told H.D. that she had been injured in a car accident. Eventually, however, she told H.D. and the police that Reed had assaulted her. She told H.D. "I just can't believe he did me like this."[17]

H.D. testified that Reed admitted his guilt to her during a car ride, saying: "you know I messed up, [H.D.], you know I messed up, you know I have anger issues."[18] H.D. asked Reed why he hit J.G. even after she was unconscious. Reed replied "I felt like my freedom was jeopardized or at risk, and that I had nothing to lose."[19] Reed told H.D. that if the truth ever came out, she would have to "watch [her] family's back."[20] H.D. testified that she did not go to the police because of Reed's threat.

J.G. testified that she initially lied about the assault because she "still loved [Reed], however warped it might have been. That's my kid's dad."[21] But she began to see things differently when Reed told her he was sick of hearing

---

[16] Report of Proceedings (Sept. 23, 2013) at 69.
[17] Report of Proceedings (Sept. 18, 2013) at 20.
[18] Id. at 23.
[19] Id. at 39.
[20] Id. at 41.
[21] Report of Proceedings (Sept. 17, 2013) at 95.

her complaints after the assault. J.G. eventually moved to Spokane where she reported the assault to authorities. The police then arrested Reed.

Once in jail, Reed told Precious in recorded phone calls not to talk to detectives and to hide his cell phone. Reed said "you don't know nothing" and also told Reed to give the phone to defense counsel. Precious expressed concern because the phone was the one Reed called Precious from on the day of the assault. When police eventually recovered the phone, most of the data from the days surrounding the assault were missing and could not be recovered. Reed also instructed Precious to pawn his gold necklace. When Officers later recovered the necklace from the pawn shop, they discovered that the clasp had been broken and put back together.

Reed admitted his criminal past at trial. He testified on direct examination that he had lived on "another side of the law, drugs, alcohol" during the 80s and 90s.[22] He said that he pleaded guilty in 1993 to assaulting a woman he "ran into . . . in the streets."[23] They were "living a destructive lifestyle, and it was a bunch of cheating on both ends."[24] Reed testified that he was also convicted of assault in 1999 and "was still involved in alcohol and drugs" at that time.[25]

Prior to cross-examination, the prosecutor argued that the defense had opened the door to questions concerning the details underlying Reed's prior

---

[22] Report of Proceedings (Sept. 26, 2013) at 303.
[23] Id. at 306.
[24] Id.
[25] Id. at 307.

assaults. She asserted that J.G. and Reed's testimony concerning their former lifestyle opened the door to further questioning on that subject. The court ruled that Reed had opened the door to questions about the 1993 assault, including the fact that Reed was the victim's pimp and that he assaulted her because "she did not put money on his books."[26]

The prosecutor then asked Reed to describe the nature of his relationship with the 1993 victim. Reed said he would rather not answer the question. After the court instructed him to answer, Reed said "I had prostitutes back then. That was part of the lifestyle that I was living in my past." When Reed said he assaulted the woman in 1993 because he felt used, the prosecutor said "wasn't that actually because she hadn't given you money?"[27] Reed denied that explanation, but conceded that the victim told police that the assault arose from a dispute over money.

In closing argument, defense counsel said the police botched the investigation by failing to check Reed's hands for injuries, test blood-stained carpeting and clothing, photograph the door and Reed's chain necklace, and take Reed's and J.G.'s cell phones into evidence. Defense counsel also argued that text messages showed that J.G. was angry at Reed for leaving her and keeping

---

[26] Id. at 388.
[27] Id. at 390-91.

her car. Counsel maintained that "she wanted to punish him" and did so by changing her original story to implicate him in the crime.

The jury convicted Reed as charged. Reed appeals.

## OPEN DOOR RULING

When a party opens up a subject of inquiry on direct examination, courts have discretion under the "open door" doctrine to allow cross-examination on that subject, including questions concerning otherwise inadmissible evidence.[28] The doctrine promotes fairness by preventing one party from raising a subject and then barring the other party from further inquiry.[29] We review decisions under the open-door rule for abuse of discretion.[30]

Reed contends the trial court abused its discretion in ruling that the defense opened the door to questions about the role prostitution played in his 1993 convictions. We disagree.

During J.G.'s testimony, defense counsel asked if she was ever jealous of Reed's involvement with other women. J.G. responded:

> Not at all. Because when I got with him in Los Angeles, he had another woman. She was in jail. *And I know what he claims to be as his profession in life. And so it's like if he had another girl, he's coming home to me every night, I don't care if he gets money from another girl, so what? I mean, that's how we lived.* It's kind of sick now.[31]

---

[28] State v. Warren, 134 Wn. App. 44, 65, 138 P.3d 1081 (2006), *aff'd on other grounds*, 165 Wn.2d 17, 195 P.3d 940 (2008); State v. Berg, 147 Wn. App. 923, 939, 198 P.3d 529 (2008).
[29] State v. Avendano–Lopez, 79 Wn. App. 706, 714, 904 P.2d 324 (1995) (quoting State v. Gefeller, 76 Wn.2d 449, 455, 458 P.2d 17 (1969)).
[30] State v. Ortega, 134 Wn. App. 617, 626, 142 P.3d 175 (2006).
[31] Report of Proceedings (Sept. 17, 2013) at 104 (emphasis added).

Reed did not object to this answer or a similar answer to a subsequent question.

Later, during his own testimony, Reed described his relationship with the 1993

victim differently:

> . . . I was in a relationship that had went bad. We were living
> a destructive lifestyle, and it was a bunch of cheating on both ends.
> And the young lady that I was charged with assaulting, I had ran
> into her in the streets, and went up to try to talk to her; she didn't talk to
> me.
> And I wound up breaking the window, and in the process,
> she got cut by some of the glass, and I was taken to jail for it. And I
> pled guilty, and did my time, and took responsibility for what I did,
> because that's how I was living back then.[32]

On cross-examination, Reed said his lifestyle with the 1993 victim involved

"illegal activities," but declined to say what they were. When the trial court ruled

that the defense opened the door to questions about those activities, Reed

testified that he "had prostitutes back then. That was part of the lifestyle that I

was living."[33] In light of the prior testimony elicited by the defense from both

Reed and J.G., and considering that Reed gave a relatively sanitized description

of the lifestyle he led in 1993 and claimed to have left behind, we conclude that

the court did not abuse its discretion in ruling that Reed opened the door to

questioning about the details of the1993 assault.

In addition, any error in the court's ruling was harmless. Errors in the

admission of prior misconduct evidence are harmless if there is no reasonable

---

[32] Report of Proceedings (Sept. 26, 2013) at 306.
[33] Id. at 390.

probability the error affected the verdict.[34] The references to Reed's involvement in prostitution were brief, cumulative of J.G.'s testimony, and an insignificant part of Reed's admitted criminal history. The evidence of Reed's guilt was also extremely strong, if not overwhelming. There is no reasonable possibility that the court's open door ruling affected the verdict.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Reed next contends his trial counsel was ineffective for failing to object to an instruction that allowed the jury to consider his assault convictions solely for determining the weight and credibility of his testimony. He also contends counsel should have requested a limiting instruction precluding the jury from using the convictions for propensity. But even assuming defense counsel's performance was deficient, there is no reasonable probability counsel's omissions affected the outcome of the trial.

To prevail on an ineffective assistance claim, Reed must establish both deficient performance and prejudice.[35] The prejudice requirement is satisfied if there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[36] "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[37] There is no

---

[34] State v. Carleton, 82 Wn. App. 680, 686, 919 P.2d 128 (1996); State v. Jackson, 102 Wn.2d 689, 695, 689 P.2d 76 (1984).
[35] Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).
[36] Strickland, 466 U.S. at 694.
[37] Id.

reasonable probability that the outcome of this trial would have been different but for counsel's alleged omissions.

As noted above, the evidence against Reed was extremely strong, if not overwhelming. His brother and sister-in-law either testified or told others that he said "I think I killed the bitch." J.G. testified that Reed assaulted her and explained why she did not immediately implicate him. J.G.'s daughter H.D. testified that Reed admitted the assault to her. Significantly, despite J.G.'s severe injuries, Reed did not call 911 for at least a half an hour and instead made multiple phone calls to his brother and his friend Joe. He even checked his phone messages. His explanation for not immediately calling 911 was that he wanted to do his own research and that J.G. did not want medical help. Given the severity of J.G.'s injuries, a jury was entitled to decide that these explanations were not credible. Likewise, the fact that police found no evidence of forced entry or missing property severely undermined the defense's unknown intruder theory.

In addition, Reed's post-assault conduct was highly incriminating. He instructed his brother to hide his phone, not to talk to the police, and to pawn his necklace. When police recovered the phone, they discovered that data from the day of the assault and the two days immediately following the assault had been deleted. When police recovered Reed's necklace, the clasp appeared to have been broken and put back together. Reed also acted strangely in J.G.'s hospital

room and she drew away from him when she saw him. When police wanted to talk to J.G. the day after the assault, Reed asked "why?"

Finally, neither attorney mentioned the instruction regarding Reed's prior convictions in closing argument. Nor did counsel suggest that the convictions could be used for propensity purposes or to assess his credibility. In light of the evidence and arguments in this case, there is no reasonable probability that any deficient performance affected the outcome.

We affirm the judgment and sentence.

Cox, J.

WE CONCUR: