# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57339-3-II |
| Respondent/Cross Appellant, | |
| v. | |
| MATTHEW BRIAN ALAN DAVIS, | UNPUBLISHED OPINION |
| Appellant/Cross Respondent | |

CRUSER, J. — Matthew Davis appeals his conviction for unlawful delivery of a controlled substance for knowingly delivering heroin. His charges arose from a controlled buy that was coordinated by Sergeant Malcolm McIver and Lieutenant Tim Rudloff of the Thurston County Sheriff's Office, employing a confidential informant (CI) who wore a wire during the transaction. They instructed the CI to purchase half an ounce of heroin and provided $450 for the purchase. The CI was out of the deputies' line of sight for about 40 minutes and gave a statement indicating that Davis sold him heroin during that time. During the recording, the deputies could hear two male voices: one asking for "a half" and another stating "450."

During plea negotiations, the State indicated to the defense that it was withholding discovery related to its CI's identity until Davis provided written confirmation as to whether he wanted to enter into a plea bargain. Davis indicated he would exercise his right to a jury trial and a confirmation hearing was scheduled. The day before the confirmation hearing, the State provided

the withheld discovery to Davis, revealing the CI's identity and producing the wire recording. Davis moved to suppress the wire recording and the CI's testimony pursuant to CrR 8.3(b), alleging that the State's delayed disclosure constituted government misconduct. The trial court granted this motion in part, suppressing the recording but allowing the CI's testimony.

Davis' case proceeded to trial, during which the CI recanted his former statement and testified that it was not Davis that sold him the heroin, but that it was his girlfriend who provided the drugs. Sergeant McIver and Lieutenant Rudloff appeared as State's witnesses. Davis, when cross examining the deputies, asked them about the 40-minute time period in which they could not see the CI. Counsel asked whether it was possible that the CI's girlfriend provided the drugs and asked about other methods of investigation, such as video recordings, that would have allowed the deputies to learn what happened during those 40 minutes. The court ruled that this line of questioning opened the door to the previously excluded wire recording. The wire recording was admitted and published to the jury, and was heavily relied on by the State in its closing argument.

Also during Davis' trial, the State questioned Sergeant McIver about Davis' demeanor and McIver responded that Davis appeared unsurprised to learn the reason for his arrest. Davis objected on the ground that the testimony was irrelevant, and that objection was overruled. The State mentioned Davis' unsurprised demeanor during its closing argument but did not rely heavily on that testimony. Davis later moved for a new trial, arguing that the comment was an improper comment on his silence. The court agreed but found that the error was harmless beyond a reasonable doubt.

Davis now appeals, arguing that the court abused its discretion when it permitted the State to introduce the wire recording pursuant to the open door doctrine. Davis also argues that the court

2

erred when it allowed the State to elicit testimony about Davis' demeanor at the time of his arrest. We hold that the trial court did not err in its application of the open door doctrine and decline to reach Davis' other claim of error.

The State cross appeals the ruling of the trial court suppressing the recording pursuant to CrR 8.3(b), but we need not reach this assignment of error because, again, we hold that the trial court did not err in ruling that Davis opened the door to admission of the wire recording. The State also cross appeals the trial court's finding on the motion for a new trial that Sergeant McIver commented on Davis' post-arrest silence during his testimony. We also need not reach this claim because the trial court properly concluded that any error was harmless beyond a reasonable doubt.

FACTS

I. UNDERLYING EVENTS

Davis was arrested after selling heroin to a CI working for the Thurston County Sheriff's Office, who wore a wire and recorded the controlled buy. The controlled buy was coordinated by Sergeant Malcolm McIver and Lieutenant Tim Rudloff of the Thurston County Sheriff's Office. The deputies outfitted the CI with a wire and followed the CI to Davis' house, where the CI had arranged to buy drugs from Davis. The deputies arrived at the scene at 2:41 PM and waited down the street while the CI entered the home. Around 3:18 PM, the CI notified the deputies that he was finished at Davis' house and the deputies picked him up. The CI handed the deputies a baggie of what was later identified as heroin. The CI gave a sworn statement indicating that he bought drugs from Davis and that no other individual was involved in the transaction. Several weeks later, McIver placed Davis under arrest.

## II. PRETRIAL PROCEDURE

Davis was charged with one count of unlawful delivery of a controlled substance for knowingly delivering heroin. During discovery, the State provided Davis' attorney with a police report indicating that the State's CI wore a wire during the controlled buy that resulted in Davis' arrest. As early as October 18, 2021, the State sent a settlement offer to Davis indicating that all offers would be off the table upon the State's disclosure of outstanding discovery, namely the CI's identity and the wire recording. The parties entered a consolidated omnibus order on December 21, 2021, indicating that discovery was not complete and that the CI's identity was not yet provided.

Negotiations continued and the trial was continued several times. On May 31 or June 1, the State emailed the defense indicating that it required written confirmation that Davis was aware that all offers would be rescinded after outstanding discovery was provided. Davis' attorney responded that he was ready to go to trial and asked for the outstanding discovery. A trial confirmation hearing was held on June 2 at which the State expressed concern that the defense would not have time to prepare for trial, which at that time was set for June 6, due to the new information it was yet to receive and suggested a continuance. The trial was continued until June 21 over a defense objection and a new confirmation hearing was set to June 9.

### A. MOTION TO SUPPRESS AUDIO RECORDING

On June 8, the State filed an amended witness list bearing the full name of the CI and provided Davis with the audio file of the wire recording. At the June 9 confirmation hearing, Davis made an oral motion to suppress the newly disclosed evidence which the court did not rule on.

Davis then filed a written motion to suppress the evidence, in which he asked for sanctions under CrR 8.3(b), alleging governmental misconduct, rather than requesting a typical discovery sanction pursuant to CrR 4.7. He argued that his case was prejudiced in part because the wire recording revealed a new witness that would need to be located and interviewed. The State responded that the defense failed to show arbitrary action or misconduct as required by CrR 8.3(b). It argued that Davis was not prejudiced because the police report indicated that a CI was used in this investigation, listed the CI's criminal history, and provided that there were other people on the property. It further argued that the defense was aware that confidential information was being withheld during plea negotiations and that the defense did not attempt to penetrate the informer privilege under CrR 4.7(f)(2). Finally, it argued that excluding the evidence was not an appropriate remedy and that a continuance would be a more appropriate sanction should the court find a discovery violation. The court heard oral argument on this motion, during which the parties restated their positions as briefed.

The court granted the motion in part and denied the motion in part, suppressing the wire recording but declining to suppress the CI's testimony. The court found that the State mismanaged the case when it failed to disclose the existence of the audio recording until the day before trial confirmation, despite Davis having been notified early on that the identity of the CI would be withheld until Davis indicated that no plea agreement would be reached. It also found that the defense was prejudiced because it did not have sufficient time to explore the evidence contained in the recording. At the time of this ruling, there were three weeks remaining in the time for trial period.

B. TRIAL

The State called Sergeant McIver as its first witness. McIver explained the events leading up to the controlled buy, as described above, culminating with the CI providing the deputies with a baggie of what would later be identified as heroin. McIver also testified that he placed Davis under arrest several weeks after the controlled buy. The State elicited the following testimony:

> Q     Did you inform Mr. Davis of why you were having contact with him?
> A     When I contacted him, yes, I did.
> Q     How would you describe his demeanor?
>        [Defense Counsel]: Objection; relevance, Your Honor.
>         THE COURT: Do you wish to be heard further on that?
>         [Prosecutor]: Yes, Your Honor.
>         THE COURT: Sidebar.
>                 (DISCUSSION HELD OFF RECORD.)
>         THE COURT: The objection is overruled.
>         You can answer the question.
> A     Mr. Davis appeared surprised to see me but not surprised to hear why he was under arrest.

2 Verbatim Rep. of Proc. (VRP) at 133. The court later explained its decision on the objection as follows:

> There was a sidebar at 9:47. There was a defense objection to relevance with respect to [testimony about Davis' post-arrest demeanor.] The response was that it was relevant because it went to consciousness of guilt and that these were as to the observation of the detective and the further elaboration on the objection was that it was not observation but speculation. And I did find that the prejudice was outweighed by the probative value, that it was relevant with respect to any observations of consciousness of guilt and that objection as to relevance was overruled as I found it relevant.

*Id.* at 154.

The State next called the CI, who recanted his witness statement and denied buying drugs from Davis. He testified that when he arrived at Davis' home for the controlled buy, Davis was not home, but that Davis eventually showed up. He testified that rather than buying drugs from Davis, he waited for his girlfriend to arrive and then he "threw her some money" and "grabbed

some drugs" out of the car she was driving. *Id.* at 183. He testified that he returned to the house and measured the amount of heroin that he was told to buy by the deputies. He was impeached by the prosecution with his sworn statement from the day of the controlled buy.

Lieutenant Rudloff later testified and corroborated McIver's description of events. During cross examination, defense counsel questioned Rudloff as follows:

> Q        Okay. And when [the CI] testified, he indicated that his girlfriend showed
>          up and she brought him the heroin. You wouldn't have been able to see that
>          person, his girlfriend, arrive from where you were parked, correct?
> A        That's correct.
> Q        So that is entirely possible that that actually happened.
>          [. . .]
> A        Is it possible? Yes.
> Q        Okay. And I went through this with McIver.
>          You're trained to collect as much evidence as possible, right?
> A        Yes.
> Q        Video is great evidence if you can get it, right?
> A        Yes.
> Q        You guys weren't wearing body cameras, were you?
> A        No.
> Q        Fingerprints are good if you can get them?
> A        Yes.
> Q        No fingerprints were taken in this case, right?
> A        No.
> Q        Did you ask to see [the CI]'s phone after you picked him up after this drug
>          deal?
> A        I did not, and I don't recall if Sergeant McIver did or not.

*Id.* at 243-44.[1]

After the jury was dismissed on the second day of trial, the State moved the court to admit the previously suppressed wire recording of the controlled buy. It argued that defense counsel opened the door to this testimony by questioning Rudloff about his ability to see what happened while the CI was at the residence, and asking if it was possible that the CI's girlfriend provided the heroin. It stated that such questioning opened the door by "putting at issue what happened while [the CI] was on the property" and that "[t]here is a wire recording that actually shows and is an audio recording of what happened during the 40 minutes that [the CI] was out of the line of sight of law enforcement." *Id.* at 248.

The court admitted the recording. It reasoned that because Davis' questions put directly at issue what occurred while the CI was out of the deputies' line of sight, and because Davis asked about whether the girlfriend could have come and gone without the deputies' knowledge, "you have opened the door to how they would have any knowledge about what happened during those

---

[1] Davis' attorney engaged in similar questioning of McIver:

    Q      But you couldn't see the residence from where you were at?
    A      No, I could not.
    Q      You couldn't see [the CI] from where you were at?
    A      I could not, no.
            [. . .]
    Q      And how long did you say that [the CI] was there [at the residence]?
    A      About 40 minutes.
    Q      And since you couldn't see him and you couldn't see people coming and you couldn't see people going, you didn't see the drug transaction occur with your own eyes?
    A      I did not, no, I did not.
    Q      Which means you definitely didn't see Mr. Davis give [the CI] any heroin?
    A      I did not see him do that, no.

2 VRP at 136-38.

40 minutes." *Id.* at 251. It declined to reconsider its ruling when presented with additional argument the next morning. The recording was published to the jury.

The State, in closing, encouraged the jury to listen again to the wire recording during deliberations. It went on to describe the portion of the wire that allegedly contains the drug transaction: "At 33:25 you hear a male voice say, 'Got a half.' At 35:20, approximately, you hear a zipper open. At 35:50 you hear '450.' " 3 VRP at 345. It went on to argue,

> You do have [the CI's] statements in court that he got the heroin from his girlfriend. But, again, you are the sole judges of the credibility of the statements and the testimony. When you evaluate whether or not that is a reasonable statement in context of all of the other evidence you have, I submit to you that it is not. You have the wire recording. The wire recording does not support the version of events that [the CI] provided to you yesterday. The wire recording does support the version of events that [the CI] provided to law enforcement on July 21st, that the defendant showed up at the property, that there was an exchange of money, and that only Mr. Davis and [the CI] were involved in that exchange and in exchange for $450 Mr. Davis gave [the CI] a half an ounce of a heroin.

*Id.* at 347. The State also noted that, when McIver contacted Davis to arrest him, "Davis was surprised to see the detective but he was not surprised about why he was being placed under arrest." *Id.* at 336. This portion of McIver's testimony was not invoked again during closing by either party.

The jury returned a verdict of guilty.

C. NEW TRIAL MOTION

Davis filed a motion for a new trial, citing an error of law and misconduct of the prosecution. He argued that McIver's testimony stating that Davis did not seem surprised to hear why he was under arrest violated Davis' right to remain silent. He argued that Davis' unsurprised demeanor was used to support an unfair inference that he was guilty of his crimes because he did not express surprise at the time of his arrest. He also argued that the door was not opened to the

wire recording because the recording was not specifically mentioned; rather, the deputies were questioned about what they could see.[2]

The State, in its response, argued that any error that occurred was harmless pursuant to the constitutional harmless error standard in the face of the overwhelming evidence of Davis' guilt.

The court concluded that McIver's testimony was indeed a violation of Davis' right to remain silent, but that the error was harmless. It reasoned that a single statement was elicited, that the State's closing did not stress any inference of guilt from Davis' silence, and that there was overwhelming evidence of Davis' guilt outside of the improper comment.

The court also concluded that it did not err in allowing the wire recording to be admitted pursuant to the open door doctrine. It reasoned that what happened during the 40-minute time period captured in the recording was a central issue at trial and that case law does not allow parties to "walk up to the door" by eliciting testimony that would be considered a "half truth." 6 VRP at 446.

Davis appeals.

## DISCUSSION

### I. WIRE RECORDING

Davis argues that the wire recording should not have been admitted by the court under the open door doctrine. He argues that he did not open the door when he questioned deputies about whether they could see what happened while the CI was in the residence, whether anyone else could have been present at the residence and sold drugs to the CI during the buy, and whether there

---

[2] Davis made an additional argument that is not before this court on appeal: that he was prejudiced by three instances of prosecutorial misconduct.

was a video recording of what happened. The State argues in its cross appeal that the wire recording was erroneously excluded in the first instance, both because the State did not commit misconduct as contemplated by CrR 8.3(b) when it notified Davis that it would withhold the name of the CI until the resolution of plea negotiations, and because if it had committed misconduct, suppression of the recording was not the proper remedy for the violation. It argues in the alternative that the trial court correctly found that Davis' questions opened the door to the recording's admittance. We agree with the State.

A. LEGAL PRINCIPLES

We review a trial court's evidentiary rulings, including its application of the open door doctrine, for abuse of discretion.[3] *State v. Rushworth*, 12 Wn. App. 2d 466, 470, 458 P.3d 1192 (2020). Though the open door doctrine is not codified in the rules of evidence, it is a theory of expanded relevance originating in common law that remains a valid evidentiary doctrine. *Id.* The trial court exercises considerable discretion in administering the open door rule. *Ang v. Martin*, 118 Wn. App. 553, 562, 76 P.3d 787 (2003).

The seminal case on the open door doctrine, *State v. Gefeller*, 76 Wn.2d 449, 455, 458 P.2d 17 (1969), explains that "[t]o close the door after receiving only a part of the evidence not only

---

[3] Davis argues that we should apply the de novo standard of review because the trial court did not have discretion to admit the recording under a theory of curative admissibility. Curative admissibility is a doctrine rejected by Washington courts that permits a party to introduce otherwise inadmissible evidence, such as hearsay evidence, to counter the effect of similarly inadmissible evidence introduced by their opponent. *Rushworth*, 12 Wn. App. 2d at 476-77. But here, Davis raised no issue with the admissibility of the recording pursuant to the rules of evidence; he successfully had the admissible recording suppressed during pretrial proceedings after complaining of its late disclosure. Similarly, its introduction was not based on Davis' violation of the rules of evidence but upon his strategic questioning that put directly at issue the contents of the wire recording. The curative admissibility doctrine was not employed by the trial court and abuse of discretion is the correct standard of review.

leaves the matter suspended in air at a point markedly advantageous to the party who opened the door, but might well limit the proof to half-truths." The open door rule thus aids in establishing the truth by permitting additional evidence "when a party opens up a *subject* of inquiry." *Id.* (emphasis added).

B. APPLICATION

We hold that the trial court did not abuse its discretion in admitting the recording because, even assuming the trial court was correct in finding that the State committed misconduct and that suppression of the recording was the proper remedy for that violation, Davis opened the door to the recording by questioning the deputies in a strategic manner that put at issue the existence of the recording and its contents. More to the point, Davis tried to capitalize on the suppression of the recording by leaving the jury with the misimpression that the deputies had no way of knowing what occurred in the house. Davis even went so far as to question whether there was a video recording of what occurred in the house that would corroborate the State's theory of the case.

The trial court here admitted the audio recording after Davis questioned Lieutenant Rudloff as to whether he would have been able to see the CI's girlfriend at the residence if she was indeed the person who sold drugs to the CI that day. Davis asked Rudloff, "So that is entirely possible that that actually happened[?]" to which Rudloff responded, "Is it possible? Yes." 2 VRP at 243-44. Counsel went on to ask Rudloff, "You're trained to collect as much evidence as possible, right?" and ask about specific types of evidence that the deputies could have obtained, including video recordings, body camera recordings, fingerprints, and electronic evidence contained in the CI's phone. *Id.* at 244.

Davis argues that his questioning was not sufficiently specific to open the door to the recording. He contends that the recording was not clearly implicated by asking the deputies whether the CI's story was possible given that deputies could not see the CI at the time of the buy. But Davis' questioning put at issue not only what happened during the 40 minutes the CI was at the residence, but also *how deputies could learn* what happened during that time period. He asked several questions implying that law enforcement could have learned what happened during that time by collecting additional evidence, but failed to do so as a result of poor investigative practices. In sum, the door to this evidence was plainly opened by Davis.

This case is similar to *State v. Gallagher*, 112 Wn. App. 601, 51 P.3d 100 (2002) , a case discussed by the State but not cited by Davis. In *Gallagher*, this court held that the trial court did not abuse its discretion in admitting previously excluded evidence that a syringe was found in the defendant's home on the grounds that the defense opened the door to this evidence. *Id.* at 610. The defense attorney in that case cross examined a detective about the *lack* of physical evidence found in the defendant's home, asking about several specific types of evidence that were not found. *Id.* at 609. We concluded that the defendant's questioning "took advantage of Detective Snaza's inability to talk about the syringes (because of the order in limine) to convey to the jury the false image that the home was devoid of drug-related activities." *Id.* at 610. The trial court's ruling in *Gallagher* avoided leaving the jury with this unfair and inaccurate impression. *Id.*

Similarly, the defense in this case questioned Lieutenant Rudloff about the *lack* of certain forms of evidence that could have shown what happened during the 40-minute time period. It specifically referenced video recordings, and implied that the deputies had *no idea* whether another party could have been the one who sold drugs to the CI in this case. Like the questions in

13

*Gallagher*, this line of questioning took advantage of Rudloff's inability to talk about the wire recording and would have left the jury with a false impression. Accordingly, admitting the recording after this exchange was proper and indeed necessary to avoid leaving the jury with "half-truths" and affording the defense with an unfair advantage. *Gefeller*, 76 Wn.2d at 455.

## II. COMMENT ON DAVIS' SILENCE

Davis argues that his constitutional right to remain silent was violated when Sergeant McIver testified that he appeared unsurprised to learn of the reason for his arrest. The State maintains that the testimony was proper, but argues that even if it was improper, any error was harmless. We agree with the State.

Article I, section 9 of the Washington Constitution provides that "[n]o person shall be compelled in any criminal case to give evidence against himself." The Fifth Amendment to the United States Constitution contains a similar provision, and Washington courts have interpreted both provisions to provide the same protection. *State v. Easter*, 130 Wn.2d 228, 235, 922 P.2d 1285 (1996). This protection prevents the State from eliciting comments on the defendant's silence when examining witnesses and from commenting on the defendant's silence in its closing argument. *Id.* at 236.

Any error in allowing this testimony was harmless beyond a reasonable doubt and does not merit reversal. *See State v. Orn*, 197 Wn.2d 343, 359, 482 P.3d 913 (2021) (errors of constitutional

magnitude[4] merit reversal only if this court is satisfied beyond a reasonable doubt that the jury would have reached the same result absent the error). Assuming, without deciding, that McIver's testimony was an impermissible comment on Davis' silence, the jury would have reached the same result absent the comment. It was a single comment as opposed to a series of questions and was not overly stressed in the State's closing argument. Instead, the State's closing stressed the overwhelming evidence against Davis in the form of the wire recording. And given that Davis failed to object on constitutional grounds at the time of the comment, and only objected on the basis of relevance, it appears likely that he did not perceive the comment to be overly prejudicial until after his conviction.

### III. CUMULATIVE ERROR

Davis argues that cumulative error deprived him of a fair trial. "Under the cumulative error doctrine, we may reverse a defendant's conviction when the combined effect of errors during trial effectively denied the defendant [their] right to a fair trial, even if each error standing alone would be harmless." *State v. Venegas*, 155 Wn. App. 507, 520, 228 P.3d 813 (2010). "The doctrine does not apply where the errors are few and have little or no effect on the trial's outcome." *Id.* Because Davis has not identified multiple errors, the doctrine does not apply here.

Finding no error, we affirm the trial court.

---

[4] The State argues that because this was an *indirect* comment on Davis' silence, we should analyze it under the more forgiving nonconstitutional harmless error standard. It cites to *State v. Romero*, 113 Wn. App 779, 54 P.3d 1255 (2002), for the notion that *all* indirect comments on a defendant's silence should be reviewed for nonconstitutional harmless error. But *Romero* actually employs a more nuanced approach. *Id.* at 790. It states that an indirect comment will nonetheless be reviewed for constitutional harmless error if the comment could "reasonably be considered purposeful, meaning responsive to the State's questioning, with even slight inferable prejudice to the defendant's claim of silence." *Id.*

No. 57339-3-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, J.

We concur:

MAXA, J.

GLASGOW, C.J.

16