IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  35350-8-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DANIEL HERBERT DUNBAR, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

Siddoway, J. — Daniel Dunbar was charged in this case with forgery of a check and the first degree theft of a travel trailer.  He decided on the morning of trial to plead guilty to the forgery, to prevent the jury deciding the theft charge from hearing about the forgery.  But the State argued strenuously and successfully that there remained a proper purpose under ER 404(b) for admitting evidence of the forged check, which had been found in the stolen travel trailer.

Evidence that a check payable to Mr. Dunbar was found in the trailer was relevant and admissible.  But there was no proper purpose under ER 404(b) for admitting additional evidence establishing that the check was fraudulently issued.  Because the error was not harmless, we reverse and remand for a new trial.  Issues of consecutive sentencing and legal financial obligations will also need to be addressed in resentencing Mr. Dunbar on the forgery count.

FACTS AND PROCEDURAL BACKGROUND

On September 11, 2016, following up on a citizen's tip, Sergeant Brian Eckersley located a travel trailer that had been stolen from the driveway of a Spokane residence sometime after the early morning of September 4, when the couple that owned it left for vacation. He called Margaret Ferrell, who had reported the trailer missing, and asked her to bring the keys to the residence on Sundown Drive in Spokane Valley, where he had found it parked. When Ms. Ferrell and her husband arrived, the sergeant used their keys to open the trailer, which was unoccupied but contained clothing and other items that were not the Ferrells'. The Ferrells identified the contents that were not theirs. Among items that did not belong to the Ferrells was what Sergeant Eckersley would describe in his police report as an "obvious forged check" made out to Daniel H. Dunbar, whom the sergeant already suspected of having resided in the stolen trailer. Clerk's Papers (CP) at 2. After removing property that did not belong to the Ferrells, the sergeant allowed them to leave with the trailer.

The next evening, Sergeant Eckersley visited Mr. Dunbar, who had been picked up on warrants a couple of nights earlier and was being held in the Spokane County Jail. After being read his *Miranda*[1] rights, Mr. Dunbar agreed to speak. He acknowledged that he and his girlfriend Brittany Snow had been staying in the trailer, which Sergeant

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Eckersley says Mr. Dunbar claimed he rented on August 28.  Mr. Dunbar said he rented it for $315 a month from a man named Ocean who owned the Sundown Drive property.  At first he told Sergeant Eckersley that he had only driven the trailer away from the property once, to a nearby dumping station.  When told that someone saw him with the trailer on September 5 on North Myrtle Street, however, he admitted stopping there to show the trailer to his 10-year-old son.  According to Sergeant Eckersley, Mr. Dunbar also admitted telling his son that he had purchased the trailer.  Mr. Dunbar denied having any knowledge that the trailer had been recently stolen.

Asked about the check that the sergeant found in the trailer, Mr. Dunbar said it was a paycheck.  The check was drawn on the account of Grassroots Therapy Group (Grassroots), and according to Sergeant Eckersley, Mr. Dunbar claimed to have worked for Grassroots doing maintenance for a couple of months.  Asked who he worked for, he identified his boss as "AZ."  Report of Proceedings (RP) at 409.

On September 14, Sergeant Eckersley listened to Mr. Dunbar's jail phone calls from the prior day.  Two calls made to Ms. Snow were of interest to the sergeant.  In the first, a morning call on September 13, Mr. Dunbar talked to Ms. Snow about her being contacted by the police about the trailer and at one point said, "Good.  That's exactly what you need to tell them"; later, he said, "[I]f [the] cops wouldn't have come, it would have been fine."  RP at 414.  In a phone call to Ms. Snow that took place a little while later, she was upset about the fact that she had no place to live and Mr. Dunbar

3

responded, "I could take another trailer," and laughed. RP at 414-15. Later in the conversation, Mr. Dunbar and Ms. Snow talked about the check the sergeant had found in the trailer.

Mr. Dunbar was charged with one count of first degree theft of the trailer and one count of forgery, for the fraudulent check. On the first day of trial, Mr. Dunbar moved to sever trial of the two counts. The motion was denied. Immediately upon the court's ruling, defense counsel notified the court that Mr. Dunbar wished to plead guilty to the charge of forgery and proceed to trial on the first degree theft.

During a CrR 3.5 hearing that followed, Mr. Dunbar challenged the relevance of a statement about the check that he contended bore only on the forgery charge. Defense counsel argued:

> I don't deny that the check can be discussed in the context of there is a check found in the trailer made out to Daniel Dunbar. But the underlying issues around that check and its legitimacy are removed. I don't think it's relevant . . . clearly any probative value is highly outweighed by its prejudicial effect.

RP at 171. Defense counsel continued, "We have had concerns with [the fraudulent check] from the beginning," and characterized it as the reason Mr. Dunbar moved to sever trial of the charges. *Id.* The court agreed, stating "I'm not comfortable yet making a comprehensive order in limine, but my ruling at this time is that any relevance that the check was forged is outweighed by the undue prejudice that it was forged." RP at 175.

4

After jury selection and before the State's case-in-chief, the defense learned from the prosecutor that the State still intended to call as a witness Lori Eastep, an owner of Grassroots. Mr. Dunbar asked that the State be required to make an offer of proof of her testimony, which he feared would be offered in "a veiled attempt to show the issue of the check being forged." RP at 315. In response, the State reminded the court that Mr. Dunbar told people he was either renting or had purchased the trailer and had also told Sergeant Eckersley that the Grassroots check was a paycheck. The prosecutor argued:

> Ms. Eastep will testify . . . that at no point in time did Grassroots Therapy Group ever employ Mr. Dunbar to do any maintenance work. He has never worked for that company and that nobody who had the authority to issue checks on that account had ever issued a check to Mr. Dunbar. In other words, can't make the argument that he had a job working maintenance for Grassroots Therapy as a basis to say that he purchased or was renting the trailer. That's it. Nothing about forged. Just that they never sent, never gave him a check.

RP at 317.

Mr. Dunbar replied that neither in his police report nor during the CrR 3.5 hearing had Sergeant Eckersley ever said Mr. Dunbar attributed his ability to rent or purchase the trailer to the check or the work he had done for Grassroots.[2] Mr. Dunbar conceded the

---

[2] The dissent mistakenly suggests that in speaking with the sergeant, Mr. Dunbar stated or implied that his work for Grassroots enabled him to rent the trailer, so evidence that the check was fraudulent was proper contradiction. But as Sergeant Eckersley admitted at trial, the subject of how Mr. Dunbar and Ms. Snow were paying rent was not volunteered or inquired into when he interviewed Mr. Dunbar. *See* RP at 424. Jurors never even learned the amount of the Grassroots check.

5

check was admissible dominion evidence. He said he would not object if the State

presented evidence that he had misrepresented to the sergeant that he had done work for

Grassroots, as long as the jury was not told that Grassroots was the drawer of the check.

But he argued that under ER 404(b), there was no legitimate purpose for offering the

"bad act" evidence that the check found in his possession had been fraudulently issued.

After lengthy argument, the trial court ruled that the "other purpose[ ]" under ER

404(b) for which it would admit Ms. Eastep's testimony was that it "demonstrates that

[Mr. Dunbar] was not telling the truth to Sergeant Eckersley, at least as Sergeant

Eckersley describes what Mr. Dunbar said." RP at 338.

Based on that ruling, the State addressed the fraudulently issued check in its

opening statement. The prosecutor told jurors that Sergeant Eckersley would testify to

finding a check in the stolen trailer that was payable to the defendant, that Mr. Dunbar

told the sergeant it was a payroll check for work he had done for Grassroots, and an

owner of Grassroots was expected to testify that "Mr. Dunbar had never been employed

by Grassroots Therapy to do maintenance work or never been employed by them at all

and that she had never even seen him before and that nobody with authorization to write

checks on the account had written a check to Mr. Dunbar or issued a check to Mr.

Dunbar." RP at 355.

In the State's case-in-chief, it called Ms. Ferrell, who testified that she and her

husband left town early on the morning of September 4, and she learned their travel

6

trailer was missing in a phone call from her brother on the morning of September 10. The State called Karen Thompson, who saw Mr. Dunbar with the trailer on Myrtle Street on September 5 and was suspicious of both the car to which it was poorly hitched and the location where it was parked. Pictures she took had assisted Sergeant Eckersley in connecting the trailer to Mr. Dunbar.

The State called Sergeant Eckersley to testify to his investigation and statements made by Mr. Dunbar. The State's final witness was Ms. Eastep, who testified to the fact that Grassroots did not hire maintenance workers and had never employed anyone named Daniel Dunbar or anyone named AZ.

Mr. Dunbar testified in his own defense. In a brief direct examination, he said he did not tell Sergeant Eckersley that he worked for Grassroots; he claimed he told the sergeant that he worked for his friend, AZ, whom he identified as Azriah Hulsey. He said his son misunderstood him if he believed he had purchased the trailer. He claimed he gave Sergeant Eckersley as much information as he could about Ocean, but without access to his phone, he could not provide contact information. Finally, he claimed that he joked when speaking to his girlfriend that he would "take another trailer" because she was upset and he hoped to make her laugh. In cross-examination, he testified that he had rented the trailer at the Sundown Drive property on September 4 and never provided the sergeant with an August 28 rental date.

Neither lawyer objected during the other's closing argument. The jury found Mr.

Dunbar guilty of first degree theft. Mr. Dunbar appeals.

ANALYSIS

Mr. Dunbar makes three assignments of error. He contends the trial court erred by

denying his objection to evidence that the check found in the travel trailer was

fraudulently issued, he raises prosecutorial misconduct challenges to the State's closing

argument, and he argues that the consecutive sentencing of the forgery conviction is not

statutorily authorized. We address the issues in that order.

I.      THE TRIAL COURT ERRED IN ALLOWING THE STATE TO OFFER ER 404(b) EVIDENCE

Mr. Dunbar does not contend that the trial court erred in admitting evidence that a

Grassroots check made payable to Daniel H. Dunbar was found in the stolen trailer. At

issue is different evidence: the evidence from which the jury would reasonably infer that

the check was fraudulent. That evidence was Sergeant Eckersley's testimony that Mr.

Dunbar said the check was a paycheck for maintenance work he performed for

Grassroots combined with Ms. Eastep's testimony that Grassroots never hired Mr.

Dunbar. Mr. Dunbar made a clear and timely objection that this evidence of the

fraudulent character of the check was not admissible under ER 404.[3]

_____

[3] Mr. Dunbar also argues on appeal that the State was improperly relying on his
poverty as propensity evidence. *See State v. Jones*, 93 Wn. App. 166, 174, 968 P.2d 888
(1998) (holding that financial status evidence is not per se inadmissible, but may be more
prejudicial than probative). He did not object on that basis in the trial court and we will

8

Evidence of a person's other bad acts is never admissible to prove the character of a person to show that he acted in conformity with his character on a particular occasion. *State v. Gresham*, 173 Wn.2d 405, 420, 269 P.3d 207 (2012). But evidence of a person's other acts may be admissible for other purposes, including to prove motive, opportunity, or intent. The purpose must be of such significance to the current trial that the evidence is highly probative and relevant to prove an "essential ingredient" of the current crime. *State v. Lough*, 125 Wn.2d 847, 863, 889 P.2d 487 (1995). Evidence admissible under ER 404(b) is substantive evidence. *State v. Wilson*, 60 Wn. App. 887, 891, 808 P.2d 754 (1991).

To satisfy itself that evidence of prior misconduct is not being employed for the purpose forbidden by ER 404(b), the trial court must, before admitting such evidence, "(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect." *State v. Yarbrough*, 151 Wn. App. 66, 81-82, 210 P.3d 1029 (2009) (citing *State v. Vy Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)). The trial court must conduct this analysis on the record. *State v. Sublett*, 156 Wn. App. 160, 195, 231 P.3d 231 (2010).

---

not entertain the argument for the first time on appeal. *See* RAP 2.5(a).

The trial court found that the purpose for which the State sought to introduce evidence that the check was not a bona fide paycheck was that it "demonstrates that [Mr. Dunbar] was not telling the truth to Sergeant Eckersley, at least as Sergeant Eckersley described what Mr. Dunbar said." RP at 338. Where evidence of a person's conduct is being offered for the purpose of attacking his credibility, however, the applicable rule is ER 608(b), not ER 404(b). ER 608(b) provides that specific instances of conduct may, "in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross examination."

The different application of the rules was explained by this court in *Wilson*. In that case, the defendant's wife provided testimony supporting his defense that he had never molested the wife's younger sister. The court allowed the State to impeach the wife by questioning her about having lied on a state financial assistance form. As *Wilson* explains, none of the information on the state financial assistance form was at issue in the sexual molestation prosecution, so the evidence of the wife's prior misconduct was not being offered as substantive evidence under ER 404(b). 60 Wn. App. at 891-92. It was instead being offered for the limited purpose of impeachment, and its admissibility was governed by ER 608(b). *Id.*

Here, once Mr. Dunbar pleaded guilty to forgery, only the check's presence in the trailer was relevant. The fact that it was a fraudulent instrument was not at issue in

10

prosecuting theft of the travel trailer. The court recognized that the State's purpose for offering it was to show Mr. Dunbar's untruthfulness.

It was an abuse of discretion for the trial court to overrule Mr. Dunbar's objection and allow the State to offer the evidence as substantive evidence under ER 404(b). The question remains whether the error was harmless. "In analyzing the erroneous admission of evidence in violation of ER 404(b), we apply the nonconstitutional harmless error standard." *State v. Gunderson*, 181 Wn.2d 916, 926, 337 P.3d 1090 (2014). This requires us to decide whether there is a reasonable probability that the outcome of the trial would have been materially affected absent the error. *Id.*

In applying ER 404, the trial court believed the State had a proper purpose for offering evidence of Mr. Dunbar's untruthfulness. That ruling strongly suggests that the court would have allowed the State to attempt to impeach Mr. Dunbar with the same information under ER 608(b). Importantly, however, evidence suggesting the check was fraudulent could not have been offered through Sergeant Eckersley and Ms. Eastep. ER 608(b) states clearly that the instances of conduct offered under the rule "may not be proved by extrinsic evidence." Instead, when Mr. Dunbar testified, the prosecutor would have been able to ask him, e.g., whether the check in his possession was fraudulent. As Professor Tegland explains:

> [I]f the witness denies the specific misconduct or incident on cross-
> examination, the inquiry is at an end. The cross-examiner must "take the

answer" (though necessarily the first answer) of the witness and may not
call a second witness to contradict the first witness. . . .
. . . The rule is designed to prevent time-consuming litigation over
issues that are only collateral to the merits of the case.

5A KARL B. TEGLAND, WASHINGTON PRACTICE, EVIDENCE LAW AND PRACTICE §

608.11, at 447-48 (6th ed. 2016) (footnote omitted).

Mr. Dunbar claims he told Sergeant Eckersley he had done maintenance work for

AZ, not Grassroots, and claimed not to know that the check was a forgery. So his answer

to any question seeking to impeach him would presumably have been, "No," ending the

inquiry.

Perhaps because the State expected to try the forgery and theft charges together, its

standalone evidence of theft of the travel trailer was not strong. Sergeant Eckersley had

not recorded his interview of Mr. Dunbar, so there was a dispute over whether Mr.

Dunbar made several incriminating statements or whether the sergeant misunderstood

him. The State had no witness or surveillance evidence tying Mr. Dunbar to the removal

of the travel trailer from the Ferrells' driveway. It had no witness or surveillance

evidence establishing that it was Mr. Dunbar who first delivered the travel trailer to the

Sundown Drive address. It did not call the owner of the Sundown Drive property to

contradict Mr. Dunbar's right to rent a trailer at the location or to dispute the existence of

Ocean. It did not have evidence that Mr. Dunbar and Ms. Snow had no assets with which

to pay rent.[4] As defense counsel argued in closing, the travel trailer was parked in plain view and had not been repainted nor had its license plates been removed. Rather than being sold or discarded, almost all of the Ferrells' belongings (which Mr. Dunbar claimed he understood were Ocean's) were still in place.

The State argues that the strongest evidence against Mr. Dunbar was the telephone recordings of the jailhouse calls, but even they were subject to alternative explanations and characterizations. And because the State had not made the recordings available to the defense by the time of trial, the court allowed the State to present only the information about the calls included in Sergeant Eckersley's police report.

We conclude that the error was not harmless, particularly given the cumulative effect of some prosecutorial misconduct, which we turn to next.

II.    PROSECUTORIAL MISCONDUCT

For the first time on appeal, Mr. Dunbar contends that two areas of the State's closing argument constituted prosecutorial misconduct. "Prosecutorial misconduct may deprive a defendant of his constitutional right to a fair trial." *In re Pers. Restraint of*

---

[4] The State proved that Mr. Dunbar never worked for Grassroots and elicited his testimony in cross-examination that Ms. Snow provided the cash to pay the first month's rent. On the issue of whether Mr. Dunbar or Ms. Snow had resources to pay $315 for the first month's rent, Sergeant Eckersley admitted when cross-examined that he didn't know if he asked Mr. Dunbar about employment apart from the maintenance work he had done for Grassroots or AZ, and didn't know if Mr. Dunbar was receiving unemployment compensation, social security disability, or other public assistance. Asked if Ms. Snow had a job, the sergeant testified that he didn't think so, but he didn't know.

13

*Glasmann*, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012).  To prevail on a claim of

prosecutorial misconduct, Mr. Dunbar must first show that the prosecutor's statements

were both improper and prejudicial.  *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653

(2012).  Once a defendant establishes that the statements were improper, prejudice is

determined under one of two standards; where, as here, the defendant did not object at

trial, the defendant is deemed to have waived any error unless the prosecutor's

misconduct was so flagrant and ill intentioned that an instruction could not have cured the

resulting prejudice.  *Id.* at 760-61.

   *Presumption of innocence / burden of proof.*  Mr. Dunlap first argues that the

prosecutor committed misconduct by arguing in closing that there were limits to the

presumption of innocence.  The issue arose because of the nature of evidence the State

relied on, given other evidence it lacked.  Because it had little evidence contradicting Mr.

Dunbar's version of events, the prosecutor asked jurors in his initial closing argument to

exercise their common sense in assessing the *plausibility* of Mr. Dunbar's claim that he

was renting the trailer for $315 a month from someone named Ocean whose last name

Mr. Dunbar could not recall.

   In response, the defense argued in part:

   The instructions that you have been read remind you that Mr.
Dunbar is presumed innocent and that he bears no burden. . . .  [The
prosecutor], in his cross-examination of Mr. Dunbar, asked him extensively
about why didn't Mr. Dunbar provide the contact information for the
homeowner; why didn't he give him the full name or the contact

> information for this person who had written him a check.  But that's all an
> attempt by the State to shift the burden on Mr. Dunbar.  Why didn't he
> prove his innocence to the detective or the sergeant?  Because he doesn't
> have to.  He didn't have to that day and he didn't have to today.

RP at 600.

It is the following rebuttal argument by the prosecutor that Mr. Dunbar argues

constituted misconduct:

> The presumption of innocence attaches when somebody is formally
> charged.  You can be arrested, but unless you are charged, there is no
> presumption of innocence.  So at the time when Sergeant Eckersley is
> speaking and interviewing Mr. Dunbar, there is no presumption of
> innocence attached to that.  It attaches as soon as the Information is filed
> charging somebody for the crime.  That's where it attaches.
>      So to claim that somehow the presumption of innocence attached
> to Mr. Dunbar as he's sitting in that interview with Sergeant Eckersley, it
> might as well be a disco ball dropping down.

RP at 603-04.

The State concedes on appeal that this argument was "perhaps confusing or

inarticulate," but contends it was a "fair response" to the defendant's argument.  Br. of

Resp't at 26-27.  We disagree.  Defense counsel's argument was proper.  But the

prosecutor's argument could lead jurors to believe that Mr. Dunbar was not required to

prove his innocence *at trial*, but had a duty to provide exculpatory information when he

was questioned by Sergeant Eckersley.

Nonetheless, while the State's argument was improper, it could have been

addressed by a timely objection and curative instruction by the court.

15

*Personal beliefs and opinions about truthfulness and motive.* Mr. Dunbar next

argues that the prosecutor improperly conveyed his opinion that Mr. Dunbar was not

telling the truth. "[A] prosecutor may not properly express an independent, personal

opinion as to the defendant's guilt." *State v. McKenzie*, 157 Wn.2d 44, 53, 134 P.3d 221

(2006). On the other hand, when a prosecutor shows that other evidence contradicts a

defendant's testimony, the prosecutor may argue that the defendant is lying. *Id.* at 59.

Mr. Dunbar argues the prosecutor committed misconduct in the following argument in

his initial closing:

> And as Sergeant Eckersley says, "Well, what about this?" Mr. Dunbar
> comes up with something else. Comes up with something else, comes up
> with something else. *And as the circle starts to close on Mr. Dunbar
> because he's not telling—he is not telling the detective what actually
> happened.*

RP at 588-89 (emphasis added).[5]

As earlier observed, when it came to facts material to the charge of first degree

theft, the State had little contradictory evidence. In context, then, the prosecutor's

---

[5] Mr. Dunbar contends the argument was especially egregious because the prosecutor had been earlier cautioned by the trial court to "please . . . not even go close to the line of ultimate opinion about either guilt or credibility." RP at 469. This happened after the prosecutor questioned Sergeant Eckersley about Mr. Dunbar's demeanor during questioning and, after the sergeant described it, asked the further question, "How did you interpret that?" The sergeant answered, "A sign of guilt." RP at 437.

An objection to the answer was sustained and the trial court granted a request to strike it. It denied a motion for a mistrial, and then cautioned the prosecutor against expressing opinions on guilt or credibility.

argument that Mr. Dunbar "was not telling the detective what actually happened" appears based on the implausibility of Mr. Dunbar's statements rather than any contradictory evidence. In arguing the implausibility, however, the prosecutor repeatedly told jurors to "use your individual collective common sense"; he did not couch his argument in terms of what he personally believed. RP at 579. In context, we do not find the prosecutor's argument to be misconduct, and any improper implication could have been cured had an objection been made.

More problematic are the prosecutor's arguments that Sergeant Eckersley had no motive but to tell the truth and it would be a crime for him to wrongly cause Mr. Dunbar to be charged. A prosecutor "may not vouch for a government witness's credibility." *State v. Embry*, 171 Wn. App. 714, 752, 287 P.3d 648 (2012). And "[i]t is . . . impermissible for a prosecutor to ask a jury to consider whether law enforcement agents would risk their careers to commit perjury." 6 WAYNE R. LAFAVE, JEROLD H. ISRAEL, NANCY J. KING & ORIN S. KERR, CRIMINAL PROCEDURE § 24.7(e), at 602 & n.67 (4th ed. 2015) (citing cases).

The United States Seventh Circuit Court of Appeals remanded a case for fact-finding when defense counsel failed to object to the following closing argument by a prosecutor in *Jordan v. Hepp*, which the appellate court characterized as "a textbook case of improper vouching:"

In Jordan's case, the prosecutor had this to say during his closing argument:

17

> Now, the big question here is the credibility. Who do you believe?
> . . . Somebody's lying. Who is it? [The detective's] going to put
> her whole career and her future on the line for this case? She does
> this everyday. She's investigating homicide cases everyday for
> years. Who has the most to lose based on your verdict in this case?
> Her or him? . . . It boils down to credibility.

The prosecutor then repeated, "[w]ho has the most to lose here? Her or him? Keep that in mind when you evaluate his testimony."

831 F.3d 837, 847 (7th Cir. 2016) (alterations in original). The appellate court remanded for a trial court determination whether defense counsel's failure to object might have been strategic. It did not hesitate in finding prejudice. It cited the United States Supreme Court for the proposition that "when a prosecutor improperly vouches for a witness's credibility, and the case is not otherwise a strong one, '[p]rejudice to the cause of the accused is so highly probable that we are not justified in assuming its nonexistence.'" *Id.* at 848 (quoting *Berger v. United States*, 295 U.S. 78, 89, 55 S. Ct. 629, 79 L. Ed. 1314 (1935)).

Here, in rebuttal, the prosecutor's argument was indistinguishable from that of the prosecutor in *Jordan*:

> Who has any motivation in this matter? Sergeant Eckersley has no
> motivation in the matter. Sergeant Eckersley is simply an investigator who
> reported what he found, testified to it, and he recorded it in a report that
> was filed within days of the contact with Mr. Dunbar.

RP at 601-02. Strengthening his argument that jurors should believe the sergeant, the prosecutor added, "[T]here is no motive on the part of Sergeant Eckersley or the State to

falsely accuse Mr. Dunbar of a crime. *That's called malicious prosecution. That itself is a crime.*" RP at 602 (emphasis added).

The prosecutor's statements were improper. We need not decide whether the misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice because we are satisfied that in combination with the trial court's error in admitting the fraudulent character of the check, a new trial of the theft charge is required. *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012).

III.     RESENTENCING IS REQUIRED, GIVEN AN INADEQUATELY SUPPORTED CONSECUTIVE
         SENTENCE

The trial court had presided over another criminal case involving Mr. Dunbar, cause no. 16-1-04019-2. It sentenced him in both cases on the same day. In imposing sentence, it ran the 22-month forgery sentence imposed in this case consecutive to the sentences imposed in cause no. 16-1-04019-2, indicating that it was doing so under RCW 9.94A.589(3). That statute does not apply to sentences that are imposed on the same day.

A different provision, RCW 9.94A.589(1)(a), authorized the trial court to order the consecutive sentencing, but only under the exceptional sentence provisions of RCW 9.94A.535. Mr. Dunbar entered the sentencing hearing with an offender score of 12 points, and the State had asked the court to impose exceptional consecutive sentences under the "free crimes" aggravator provided by RCW 9.94A.535(2)(c).

RCW 9.94A.535 provides that in imposing an exceptional sentence, "the court shall set forth the reasons for its decision in written findings of fact and conclusions of law." The trial court did not enter findings and conclusions supporting exceptional sentencing. The entry of written findings has been held to be "essential." *State v. Friedlund*, 182 Wn.2d 388, 393, 341 P.3d 280 (2015).

If the trial court intended to impose an exceptional sentence, entry of supporting findings is required. If it did not, then the forgery sentence must run concurrent to the other sentences imposed on the same day.

IV.     RELIEF FROM LFOS

Finally, Mr. Dunbar has moved this court to direct the trial court to strike its imposition of the $200 criminal filing fee and the $100 DNA[6] collection fee. Because this matter was on direct review at the time legislative changes to the application of those fees became effective in June 2018, the changes apply. *State v. Ramirez*, 191 Wn.2d 732, 749, 426 P.3d 714 (2018).

The record reveals that Mr. Dunbar was found indigent by the trial court at the time of sentencing, so he is entitled to relief from the $200 criminal filing fee. RCW 36.18.020(2)(h). In light of his criminal history, it is likely his DNA has previously been collected, in which case he is entitled to relief from the DNA collection fee. RCW

---

[6] Deoxyribonucleic acid.

20

43.43.7541. Upon resentencing, the court shall strike the criminal filing fee and shall strike the DNA collection fee unless the State demonstrates that Mr. Dunbar's DNA has not previously been collected.

We reverse the conviction for first degree theft and remand for retrial of that charge and resentencing.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

I CONCUR:

_____
Lawrence-Berrey, C.J.

No. 35350-8-III

KORSMO, J. (dissenting) — The story behind the forged check was highly relevant and added little to the overall prejudice of the evidence against Mr. Dunbar. Accordingly, I do not see that the trial court abused its discretion in admitting the evidence under limiting rules that prohibited proof that Mr. Dunbar himself had forged the check.

Mr. Dunbar concedes that the check was admissible to help establish his dominion and control over the stolen trailer. Thus, the relevance of the evidence is clear. It, and any other items "belonging" to Mr. Dunbar, helped show that he controlled the stolen trailer.[1] The more important piece of the puzzle, however, was that he told a lie about the check while also lying about renting the trailer.

During the same jail conversation in which he told Sergeant Eckersley that he and his girlfriend were renting the trailer, he described the check as a paycheck for work he had done for Grassroots Therapy Group. The two lies were part and parcel of the same story and both were fair game for the prosecutor to go after. This was basic impeachment

---

[1] The paycheck also supported Mr. Dunbar's claim that he was merely renting the trailer by suggesting that he was employed and capable of paying rent. The State necessarily would want to counter that erroneous impression by showing that the check was not evidence of employment.

by contradiction and it served to disprove Mr. Dunbar's initial defense. He lied about working for Grassroots Therapy Group and receiving pay from them. The company came in and disputed his statements. All was proper. There was no mention about the forged check, nor was there any indication who might have prepared it. The trial judge limited the evidence to its essential points while still allowing the prosecutor to contest a false tale.

Similar practice has been permitted over the years on evidence far less germane than this one. When someone "puts his prior conduct into issue by testifying as to his own past good behavior, he may be cross-examined as to specific acts of misconduct *unrelated to the crime charged.*" *State v. Emmanuel*, 42 Wn.2d 1, 14, 253 P.2d 386 (1953) (emphasis added); *accord, State v. Swan*, 114 Wn.2d 613, 653-654, 790 P.2d 610 (1990); *State v. Renneberg*, 83 Wn.2d 735, 738, 522 P.2d 835 (1974); *State v. Gefeller*, 76 Wn.2d 449, 455, 458 P.2d 17 (1969), *overruled on other grounds by State v. Hill*, 123 Wn.2d 641, 870 P.2d 313 (1994). This case is even closer because the misconduct was in fact related to the crime.[2]

---

[2] This was not a situation where the defendant was being impeached on a collateral matter. "It is a well recognized and firmly established rule in this jurisdiction, and elsewhere, that a witness cannot be impeached upon matters collateral to the principal issues being tried." *State v. Oswalt*, 62 Wn.2d 118, 120-121, 381 P.2d 617 (1963) (citing numerous cases).

2

Mr. Dunbar should not be allowed to provide a story explaining his allegedly lawful occupancy of the trailer without fear of his lie being contradicted. Knowing what the defense theory of the case was, the prosecutor understandably worked to undercut it while also proving his own case. The critical evidence here was not who uttered the forged check, an issue that was never mentioned before the jury, but whether Mr. Dunbar's false claim of employment, supported by the check, could be countered by his putative employer. The trial judge understandably decided this was proper.

Since the trial court had very tenable grounds for admitting the evidence, there simply was no abuse of discretion. I respectfully dissent.

Korsmo, J.