IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 77512-0-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| GERALD LOCKET HATFIELD JR., | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | FILED: December 2, 2019 |

HAZELRIGG-HERNANDEZ, J. — Gerald Locket Hatfield Jr. seeks reversal of his convictions for burglary in the first degree and robbery in the first degree, alleging that numerous errors by the trial court individually and collectively denied him the right to a fair trial. Because we conclude beyond a reasonable doubt that the errors were individually and cumulatively harmless in light of the overwhelming evidence of his guilt, we affirm.

## FACTS

On March 12, 2015, Stephen Dillenburg approached Charles Brown at the home of a mutual friend and asked if he would be interested in making some money. Dillenburg said he planned to rob some acquaintances of drugs and money and wanted Brown to be a lookout. Brown agreed, and the two men were joined by Gerald Hatfield as they left the apartment. The three men got into a light-colored sport utility vehicle (SUV), and Hatfield drove them to Lake City.

Kevin Boggs was renting a house in Lake City from his parents and subletting the basement to Adrien Diaz. Diaz sold drugs, primarily heroin, out of the house and paid rent to Boggs in the form of drugs. Boggs would occasionally act as a go-between when buyers come to the house because the basement was off-limits to guests.

When the men arrived at Boggs' house, Boggs recognized Dillenburg because they had previously met through a mutual friend and invited the men in despite the late hour. They told Boggs they wanted to buy heroin and gave him cash. Brown testified that Boggs told them to follow him downstairs, so he and Hatfield went downstairs while Dillenburg stayed upstairs. However, Boggs testified that he told them all to wait upstairs and went to the basement to get the drugs from Diaz. When Boggs heard footsteps and turned to tell them to return to the main level, he saw Hatfield descending the stairs holding a semi-automatic handgun. Boggs shouted to Diaz that they were being robbed. Diaz handed Hatfield a small quantity of money and drugs, which was all they had on hand. Boggs said that Brown demanded their hidden stash of drugs and money, but they denied having a stash. Brown started gathering laptops and phones from the basement and putting them in a pillow case. Boggs testified that, at one point, Hatfield grabbed a pillow off the floor and covered the muzzle of the gun as if to silence a shot with it.

A security camera downstairs captured a portion of the incident. The video showed Hatfield holding a gun, shoving Boggs three times, hitting or threatening to hit Boggs with the gun, and covering the muzzle of the gun with a pillow and

pointing it at Boggs. The recording ended when Hatfield appeared to notice the camera and reached for it.

After the men had been downstairs for a few minutes, Boggs said he heard Brown ask Diaz what he was doing, and the two began grappling. Boggs saw a second gun and heard a loud click. Brown ran out of the room, and Boggs saw Diaz level a silver revolver at Hatfield. Diaz may have fired a shot; Boggs was unsure whether he had heard one or two shots. Hatfield fired a shot, which hit Diaz in the right upper thigh.

Brown denied getting into a scuffle with anyone and said that he was in the downstairs bedroom when he heard gunshots and fled. Brown thought there were two guns fired because the shots sounded like they came from two different locations. Brown and Hatfield ran up the stairs, and the three men ran back to the vehicle. As they drove away, Hatfield said that Diaz had shot at him, so he shot back. The men pulled into a parking lot, divided the stolen items, and parted ways.

Boggs called 911. Diaz was taken to the hospital and treated for the gunshot wound to his leg and a second graze wound on his inner thigh. Diaz admitted to emergency personnel that he used heroin and cocaine. Police found a spent nine millimeter bullet on the floor on the basement and a hole in the basement ceiling that appeared to be from a bullet.

Five days later, officers returned to the house to collect the digital video recorder (DVR) containing the video footage from the downstairs security camera. When they arrived, Diaz gave them a spent nine millimeter shell casing. Diaz was reluctant to turn over the DVR to police because he believed the video would also

show him using drugs and having sex with his girlfriend. He asked the officers to constrain their review of the video to the time frame of the incident. After they agreed, Diaz turned over the DVR. The lead detective asked a Seattle Police Department video technician to download a portion of the video in a one-hour time frame surrounding the incident.

During the course of the investigation, Boggs gave police Dillenburg's name and later identified him as one of the robbers in a photo montage. Officers determined that Hatfield was a person of interest in the case. When presented with a photo montage including Hatfield's picture, Boggs also identified Hatfield as one of the men who robbed him.

Hatfield was apprehended in his vehicle, which was impounded and searched. The vehicle contained a nine millimeter semi-automatic SIG Sauer pistol and nine millimeter ammunition. Arresting officers also found nine millimeter ammunition on Hatfield's person. When Hatfield was interviewed by detectives, he admitted that the man in the video recording looked like him but denied that he had committed the robbery. Hatfield was charged with burglary in the first degree, robbery of Diaz in the first degree, robbery of Boggs in the first degree, and unlawful possession of a firearm in the first degree.

Hatfield made a general motion in his trial brief to exclude all out-of-court statements under the evidentiary rule prohibiting hearsay and the confrontation clause. In his oral argument on the motion, he specified that he was seeking exclusion of hearsay statements from Diaz and the three other residents of the

Lake City house, none of whom were expected to testify at trial. The court indicated that the ruling would be reserved for trial testimony.

Hatfield's trial brief included a separate "Motion to Exclude Hearsay by Police Officers," which argued that "[a]ll statements by police officers regarding why they did what they did" were irrelevant at trial. Hatfield argued orally that this motion was "specifically geared toward law enforcement as to information they may [have] receive[d] from . . . dispatch." He argued that the police officers' responses to "[i]nformation they receive[d] from other witnesses that does not fall within the hearsay exception, any information from in-car computers, from other officers or from anybody else" were "no longer relevant" and were "hearsay, and potentially [raised] confrontation issues as well." The remainder of the discussion focused on the statements that the dispatcher had relayed to the responding police officers on the night of the incident. The court denied the motion in part and granted it in part as to statements provided by the dispatcher, noting that "statements are not offered to prove the truth of the matter asserted, but responding officers may testify to what was said to them to explain how and why they acted in the manner they did," but reserved ruling as to information provided by other witnesses.

Hatfield also moved in his trial brief to exclude the shell casing that Diaz had turned over to investigating officers on the grounds that chain of custody had not been established. In the concluding paragraph of his written argument, he wrote:

> In this case, the shell casing is not readily identifiable as [the] shell casing from the alleged incident. Police did not recover the shell

casing from the scene despite several officers being present. The casing was not turned over the same date as the alleged incident but four to five days later. Only Diaz can say the item is the same item that he recovered at the house from the date of the incident. Uncertainty of the shell casing's origin is a major issue. At the time of this writing, the Defense has not interviewed Diaz and does not expect him to testify at the trial. Any statements that Diaz recovered the shell casing from the house and that the shell casing was involved in the alleged charged offenses is hearsay and violates the Defendant's Sixth Amendment Right to confront Diaz about these statements.

During oral argument on the pretrial motions, Hatfield argued that the State could not establish the chain of custody for the shell casing before it was delivered to law enforcement. He made a brief reference to Diaz's statements, saying "[a]ny statements that he made with regard to the shell casing I think would not be admissible absent his testimony." The State's response and Hatfield's rebuttal focused entirely on the chain of custody argument. The court denied the motion to exclude the shell casing on the grounds that any uncertainty about the origin of the shell casing went to the weight of the evidence rather than its admissibility. The court did not mention any hearsay or confrontation grounds in its ruling.

At trial, Boggs identified Hatfield as the man who shot Diaz. Brown, who had plead guilty to robbery in the first degree and burglary in the first degree, also testified at Hatfield's trial and identified Hatfield as the gunman. The State called Dillenburg as a witness but he took the stand and refused to testify. Diaz and the other occupants of the house could not be located at the time of trial and so did not testify.

Officer Jeffrey Mitchell testified that he and Detective Michael Magan had met with Diaz five days after the incident at the house in Lake City to collect the

DVR. He testified that Diaz gave them a shell casing that he said he had found after the investigating officers left. Hatfield objected on hearsay grounds. The State responded that the statement was not offered for the truth of the matter asserted but to explain the officers' investigative actions. The court allowed the evidence for that limited purpose and informed the jury that Diaz's statement was not offered for the truth of the matter.

During Detective Magan's testimony, the State asked him if Diaz had turned over anything other than the DVR on March 17. He responded that Diaz had given them "a shell casing that he found in his bedroom." Hatfield did not object to this testimony. When Detective Magan testified that officers found nine millimeter bullets on Hatfield's person when they arrested him, the State asked whether there was other nine millimeter ammunition associated with the investigation. Detective Magan responded that the bullet recovered from the scene and the shell casing that Diaz had "found in his room" were both nine millimeter ammunition. Hatfield did not object to that testimony.

Dijana Coric, a forensic scientist in the Washington State Patrol Crime Lab's firearm and toolmark section, testified that she performed a forensic analysis of a firearm and shell casing associated with this case. On direct examination, she testified at length to her training, education, and experience; to the theory of firearm toolmark comparison; and to the method she employed in analyzing the evidence in this case. She testified that she performed a side-by-side microscopic comparison of the recovered shell casing and a test-fired casing from the SIG Sauer pistol found in Hatfield's vehicle. She was able to match breechface marks,

firing pin impression marks, and chamber marks. Coric concluded that the recovered shell casing had been fired by the pistol from Hatfield's vehicle.

On cross-examination, Hatfield asked Coric whether she agreed that the theory of identification that she utilized in her analysis of the shell casings "lacks an objective standard." She responded, "It is subjective based on one's training and experience." He continued to question her about the subjectivity of the analysis and scholarly criticism to the theory of identification, resulting in the following exchange:

> Q: All right. And you get to decide whether or not two samples match based upon a visual comparison; is that right?
> A: Based on my training and experience, yes.
> Q: Okay. And a match is determined if you decide there is significant agreement between the two—two items, right?
> A: Based on a theory of identification, yes.
> Q: Right, but significant agreement is also not defined in the field?
> A: Percentage-wise, no. Not with pattern matching.
> Q: There are no set number of objective criteria that must be met in order to form significant agreement.
> A: Are you referring to how many points you're looking for before you make a match?
> Q: Well, I'll get to that in a second, but there are no set number of objective criteria that you need to meet before you say that there's significant agreement.
> A: Well, the class have to be similar, and then there has to be sufficient agreement between the individual.
> Q: Again, that's a determination only you get to make, correct?
> A: And my peer-reviewer.
> Q: All right. There are no protocols or standards, and no set criteria exists for declaring what a match is.
> A: Well, there's the AFTE theory of identification.
> Q: Other than the theory itself.
> A: And significant research, yes, behind the validity—
> Q: Okay.
> A: —of it, yes.
> Q: You would agree with me that the conclusion, whether or not something matches, is based upon your competence and your experience, correct?
> A: Yes.

Hatfield did not object to Coric's statement about her peer reviewer or move to strike the testimony.

After Hatfield finished his cross-examination, the State noted outside the presence of the jury that it had not inquired about the peer review process at the Washington State Patrol Crime Lab on direct examination because it "could potentially be a violation of [the] confrontation clause." However, the State argued that Hatfield had opened the door to evidence about the peer review process with his questioning. Hatfield disagreed, arguing that he was questioning Coric about her conclusions alone, "not about whether or not any other individual did any additional—reached the same conclusions based upon their independent evaluation of that." He argued that he did not ask the witness whether anyone else had evaluated the evidence, and she had simply volunteered the information that a peer reviewer was involved. He contended that further testimony about the peer reviewer would be hearsay and would violate the confrontation clause. The State responded that the thrust of the cross-examination was that Coric "all on her own just decides to call out a match or not. That is simply not true."

Coric provided an offer of proof that her work is subject to a technical peer review process in which another trained firearm and toolmark examiner reviews the same evidence and comes to an independent conclusion. Coric's report would not issue unless she and the peer reviewer reached the same conclusion. The court ruled that it would allow the State to inquire into peer review, but Hatfield would also be allowed a fair amount of cross-examination as to the meaning of that peer review. Hatfield noted a standing objection to any line of questioning

related to peer review on the grounds that it was beyond the scope of cross-examination and violated the confrontation clause.

On redirect examination, the State elicited testimony from Coric about the technical peer review process. Coric identified the colleague who had performed the technical review in this case and stated that he agreed with her conclusion. On re-cross examination, Hatfield asked Coric whether her peer reviewer used the same theory of identification that she relied on, and she responded that he did. He elicited testimony that the reviewer was Coric's coworker and not a supervisor.

The jury found Hatfield guilty of burglary in the first degree and robbery in the first degree. The jury also found by special verdict that Hatfield was armed with a firearm at the time he committed both crimes. The State elected to dismiss the charge of unlawful possession of a firearm in the first degree in light of the jury's verdicts and in the administration of justice. The court found that the evidence was insufficient for a rational trier of fact to find Hatfield guilty of count three, the first degree robbery charge naming Boggs as the victim, and dismissed the charge. The court found that Hatfield was a persistent offender as defined by RCW 9.94A.030 and sentenced him to life in prison without the possibility of parole.

ANALYSIS

I.     Preservation of Evidence

Hatfield contends that the trial court erred in denying his motion to dismiss or, in the alternative, to exclude the video evidence because the police failed to preserve the portion of the video from the basement security camera that depicted Diaz using drugs. He argues that the failure to preserve the rest of the video

violated his essential due process rights to fundamental fairness and a meaningful opportunity to present a complete defense under the Fourteenth Amendment.[1]

We review a claimed violation of a defendant's constitutional right to due process de novo. State v. Johnston, 143 Wn. App. 1, 11, 177 P.3d 1127 (2007). To comply with the Fourteenth Amendment's guarantee of due process, the State "has a duty to disclose material exculpatory evidence to the defense and a related duty to preserve such evidence for use by the defense." State v. Wittenbarger, 124 Wn.2d 467, 475, 880 P.2d 517 (1994) (citing Brady v. Maryland, 373 U.S. 83, 10 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); California v. Trombetta, 467 U.S. 479, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984)). If the State fails to preserve material exculpatory evidence, the criminal charges must be dismissed. Id. "In order to be considered 'material exculpatory evidence', the evidence must both possess an exculpatory value that was apparent before it was destroyed and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. (citing Trombetta, 467 U.S. at 489).

If unpreserved evidence is not "material exculpatory evidence" but is "potentially useful" to the defense, the failure to preserve constitutes a denial of due process only if the defendant can show bad faith on the part of law enforcement. Arizona v. Youngblood, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988). "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the

---

[1] Although Hatfield advanced several theories in support of his motion below, he assigns error only to the denial of the motion to dismiss based on an alleged violation of his right to due process.

exculpatory value of the evidence at the time it was lost or destroyed." Id. at 57, n.*. The United States Supreme Court has been unwilling "to read the 'fundamental fairness' requirement of the Due Process Clause . . . as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." Id. at 58.

Diaz admitted to the police that the recording contained video of him using narcotics. The officers who heard Diaz make this statement were available to testify at trial and did in fact testify as to Diaz's admission. Hatfield argues that Diaz's admission to police about what the video would show was not comparable evidence "because visual evidence can be more persuasive than testimony." Although video evidence may be more persuasive than testimony in many instances, in this case, the statements of two police officers to whom Diaz admitted using drugs were comparable to the unpreserved video evidence.

Hatfield also argues that the exculpatory value of the unpreserved video evidence was apparent because it constituted impeachment evidence. Evidence of drug use by a witness is admissible for impeachment purposes if there is "a reasonable inference that the witness was under the influence of drugs either at the time of the events in question, or at the time of testifying at trial." State v. Tigano, 63 Wn. App. 336, 344, 818 P.2d 1369 (1991). Statements of a non-testifying witness are subject to impeachment. ER 806. Hatfield does not provide a citation to any authority stating that potential impeachment evidence possesses apparent exculpatory value. "Where no authorities are cited in support of a

proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none." DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962). Hatfield has not shown that the exculpatory value of the potential impeachment evidence was apparent to law enforcement. Because he has not met either prong of the Wittenbarger test, the unpreserved video evidence was not material exculpatory evidence.

Although the evidence was not materially exculpatory, it was potentially useful to Hatfield as impeachment evidence. In response to the State's inquiry as to whether the court was making a finding that the detective did not act in bad faith, the court responded, "I do not find that the Detective acted in bad faith." This statement is not unambiguously equivalent to a finding that the detective did not act in bad faith, and written findings of fact on the motion to dismiss are not of record with this court. However, the denial of the motion to dismiss implies a finding that law enforcement did not act in bad faith, which we review for substantial evidence. See State v. Ortiz, 119 Wn.2d 294, 301–02, 831 P.2d 1060 (1992), overruled on other grounds by State v. Condon, 182 Wn.2d 307, 343 P.3d 357 (2015).

At the time the trial court considered the motion to dismiss, the court had already heard testimony from the detective assigned to the case during a CrR 3.5 and 3.6 hearing. He testified that Diaz had been reluctant to turn over the DVR containing the video of the incident to police because "there was surveillance video on that DVR of him having sex with his girlfriend . . . as well as narcotics use." The detective testified that Diaz asked him to constrain his review of the video to the

time frame of the incident. After he agreed, Diaz turned over the DVR and the detective asked a Seattle Police Department video technician to download the portion of the video in a one-hour time frame surrounding the incident.

Hatfield argued below that the detective's knowledge that the remainder of the video contained evidence of Diaz's drug use was sufficient to establish bad faith. He does not argue bad faith at all in his appellate briefing. Because Hatfield has not established that the police knew of any exculpatory value of the evidence when they failed to preserve the remainder of the video, he has not shown that they acted in bad faith. The trial court did not err in denying the motion to dismiss.

## II.     Ineffective Assistance of Counsel

Next, Hatfield argues that his trial counsel provided him with ineffective assistance by failing to argue that additional portions of Hatfield's interrogation should be admitted under the rule of completeness.

Every criminal defendant is guaranteed the constitutional right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 685–86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Grier, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). To establish a claim of ineffective assistance, the defendant must show that his counsel's performance was deficient and that the deficient was prejudicial. Strickland, 466 U.S. at 687. If either prong of the test is not satisfied, our inquiry ends. State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

Deficient performance is that which falls below an objective standard of reasonableness based on consideration of all the circumstances. State v. McFarland, 127 Wn.2d 322, 334–35, 899 P.2d 1251 (1995). "Courts engage in a

- 14 -

strong presumption counsel's representation was effective." Id. at 335. Matters that can be characterized as legitimate trial strategy or tactics do not constitute deficient performance. State v. Kyllo, 166 Wn.2d 856, 863, 215 P.3d 177 (2009).

To satisfy the second portion of the Strickland test, a defendant must show that there is a reasonable probability that the result of the trial would have been different but for counsel's alleged error. 466 U.S. at 694. Although this standard does not require a defendant to show that the action more likely than not altered the outcome, "[t]he likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 562 U.S. 86, 112, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

The State offered a redacted version of Hatfield's recorded interview with police that omitted references to prior convictions, prior police contact, and another ongoing robbery investigation. The jury saw sections of Hatfield's interview with police in which he admitted that the gunman in the security footage looked like him and asked if they could work out a deal for reduced charges. The segments of the video that were not shown to the jury included five more statements from Hatfield that the robber in the video looked like him, accompanied by explicit statements that he was not the man in the video.

Hatfield contends that his counsel was deficient in failing to argue for the inclusion of these additional statements. However, Hatfield's trial counsel may reasonably have concluded that Hatfield's repeated admissions that the man looked like him would be more damaging than his explicit denial of identity would

be helpful. Because this calculus could be characterized as a legitimate trial strategy or tactic, counsel's performance was not deficient.

Hatfield argues that his trial counsel's alleged error was prejudicial because allowing the statement that the perpetrator looked like him without the clarification that it was not him undermined his defense of identity. He contends that the other evidence of his guilt was not so overwhelming as to render this error trivial because there were challenges to Boggs' and Brown's credibility and the expert's conclusion tying the gun to the shell casing was subject to debate.

The State acknowledged in its closing argument that the major issue was the identity of the shooter. The State argued that Hatfield's statement that the person in the video looked like him and subsequent attempt to bargain with police indicated that "[h]e knew he was caught." The State characterized this as an "acknowledgement of his resemblance." In Hatfield's closing, his counsel agreed that the primary issue was identification. He argued that the implication when Hatfield said the person in the video looked like him was that "it's not him, but it looks like him." Defense counsel argued that Hatfield offered to cut a deal with police because he knew he would begin experiencing heroin withdrawal symptoms soon.

It was clear throughout the trial that Hatfield's defense was based on identity. The State did not argue that Hatfield's statement that the man in the video looked like him amounted to a confession. Two witnesses identified Hatfield as the shooter at trial. The jury viewed the video of the man wielding a gun during the robbery and were able to decide for themselves whether that man in the video was

- 16 -

Hatfield. Admission of Hatfield's clarifying statement in the recorded interrogation that the man looked like him but was not him was not likely to have changed the outcome of the trial. Because he cannot show deficient performance or prejudice, Hatfield's claim of ineffective assistance of counsel fails.

III.    Motion for Frye Hearing

Hatfield contends that the trial court erred in denying his request for a Frye[2] hearing on ballistic identification because there is "significant dispute among qualified experts in the scientific community about" the validity of the method used to establish comparison.[3] Hatfield devotes a significant portion of his briefing to this issue, arguing that the 2008 and 2009 reports of the National Research Council of the National Academy of Sciences (NAS) and the 2016 President's Council of Advisors on Science and Technology (PCAST) report call the validity of the science into question.

When ruling on Hatfield's motion for a Frye hearing, the trial court recognized that Washington appellate courts had continued to approve of ballistics identification evidence after the 2008 and 2009 NAS reports were published. The court framed the relevant question as whether the 2016 PCAST report raised a significant enough dispute as to the general acceptance of the evidence to necessitate a Frye hearing for ballistics. The court found that it did not.

---

[2] Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).
[3] Although Hatfield's assignment of error includes both the trial court's denial of the motion for a Frye hearing and admission of the evidence, Hatfield does not argue that the evidence should not have been admitted even if a Frye hearing was not required. We decline to address this issue in the absence of argument. See Palmer v. Jensen, 81 Wn. App. 148, 153, 913 P.2d 413 (1996) ("Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.").

Washington courts use the Frye test to evaluate scientific evidence. State v. Gregory, 158 Wn.2d 759, 829, 147 P.3d 1201 (2006), overruled on other grounds by State v. W.R., Jr., 181 Wn.2d 757, 336 P.3d 1134 (2014). Under Frye, scientific evidence is not admissible unless "[b]oth the scientific theory underlying the evidence and the technique or methodology used to implement it" are generally accepted in the relevant scientific community. Id. Although scientific opinion need not be unanimous, the evidence may not be admitted if there is a significant dispute among qualified scientists in the relevant community. Id. Once a particular methodology has been generally accepted in the community, "application of the science to a particular case is a matter of weight and admissibility under ER 702." Id.

We review the trial court's determination of whether to hold a Frye hearing de novo. Id. at 830. The Washington Supreme Court has remarked that:

> Once this court has made a determination that the Frye test is met as to a specific novel scientific theory or principle, trial courts can generally rely upon that determination as settling such theory's admissibility in future cases. However, trial courts must still undertake the Frye analysis if one party produces new evidence which seriously questions the continued general acceptance or lack of acceptance as to that theory within the relevant scientific community.

State v. Cauthron, 120 Wn.2d 879, 888 n.3, 846 P.2d 502 (1993), overruled on other grounds by State v. Buckner, 133 Wn.2d 63, 941 P.2d 667 (1997).

Hatfield argues that "[t]here is no Washington precedent on whether ballistic identification evidence is admissible under the Frye standard" and "no appellate court anywhere in the country has addressed ballistic evidence under the Frye standard in light of the newly minted PCAST report." However, after Hatfield

submitted his briefing, we considered a nearly identical challenge to the validity of ballistic identification methodology in State v. DeJesus. 7 Wn. App. 2d 849, 436 P.3d 834 (2019). In DeJesus, the challenged scientific evidence stemmed from a Washington State Patrol Crime Laboratory analyst's comparison of two spent shell casings and conclusion that they were fired from the same gun. Id. at 858. DeJesus argued that there was a "significant dispute among qualified scientists in the relevant scientific community about the validity of ballistic identification methodology." Id. at 860. He cited the 2008 and 2009 NAS reports and the 2016 PCAST report in support of his argument. Id. at 861. We rejected his contention, finding that:

> [T]he reports on which DeJesus relies do not affect the general scientific acceptance of ballistic identification. Instead, the problems they espouse bear on the question of reliability of the individual test and tester at issue. These questions are then considered by the trier of fact in assessing the weight to be given the evidence.

Id. at 863–64. We also looked to other jurisdictions and concluded that "[c]ourts from around the country have universally held that toolmark analysis is generally accepted." Id. at 865.

Because DeJesus considered the same challenges to the validity of the evidence, we may rely on the previous judicial determination that this method of ballistics identification satisfies the Frye test. The trial court did not err in denying Hatfield's request for a Frye hearing on this evidence.

IV. Admission of Out-of-Court Statements

Hatfield contends that the court violated his Sixth Amendment right to confront witnesses against him by admitting statements of two non-testifying witnesses at trial. He also contends that these statements constituted inadmissible hearsay. We conclude that these constitutional errors were harmless beyond a reasonable doubt.

A. Diaz Statement

Hatfield first argues that the court erred in admitting Diaz's out-of-court statement to police officers that he had found the shell casing in the basement.

1. Hearsay

Hatfield contends that Diaz's statement regarding the shell casing was inadmissible hearsay. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Hearsay evidence is not admissible unless an exception or exclusion applies. ER 802. "A statement is not hearsay if it is used only to show the effect on the listener, without regard to the truth of the statement." State v. Edwards, 131 Wn. App. 611, 614, 128 P.3d 631 (2006). We review de novo a trial court's legal determination of whether a statement is hearsay. State v. Gonzalez-Gonzalez, 193 Wn. App. 683, 688–89, 370 P.3d 989 (2016).

The State argues that the statement was not hearsay because it was not offered for its truth but to prove "why police accepted the casing from [Diaz] and had it analyzed." "Out-of-court declarations made to a law enforcement officer may

be admitted to demonstrate the officer's or the declarant's state of mind only if their state of mind is relevant to a material issue in the case; otherwise, such declarations are hearsay." State v. Johnson, 61 Wn. App. 539, 545, 811 P.2d 687 (1991). "[I]f necessary at trial for the officer to relate historical facts about the case, it would be sufficient for him to report he acted upon 'information received.'" State v. Aaron, 57 Wn. App. 277, 281, 787 P.2d 949 (1990) (quoting E. Cleary, McCormick on Evidence § 249, at 733 (3d ed. 1984)).

The State does not specifically explain why the officers' state of mind was relevant to a material issue in the case, nor is the reason evident from the record. The State argues that the officers would have had no clear reason to analyze the shell casing given to them by Diaz without his statement explaining where he had found the object. This is not persuasive. Even if a person who had recently been shot in his home wordlessly handed a shell casing to officers investigating the shooting, it strains credulity to suggest that the officers would disregard the object. Because the investigating officers' state of mind was not relevant to a material issue in this case, Diaz's statement that he found the shell casing in the basement was hearsay.

2. Confrontation Clause

Hatfield also contends that the court violated his Sixth Amendment right to confront witnesses against him by admitting Diaz's statement about the origin of the shell casing at trial. The State responds that Hatfield failed to object to the testimony on confrontation clause grounds and therefore has waived review of this issue. Hatfield argues that his pretrial motions and hearsay objection at trial were

sufficient to preserve the alleged confrontation error for review or, in the alternative, that this is a manifest constitutional error that may be raised for the first time on appeal.

As a preliminary note, since the completion of the briefing in this case, the Washington Supreme Court has held that a defendant must assert his right to confrontation at trial to preserve the challenge for appeal. State v. Burns, 193 Wn.2d 190, 210–11, 438 P.3d 1183 (2019). "Where a defendant does not object at trial, 'nothing the trial court does or fails to do is a denial of the right, and if there is no denial of a right, there is no error by the trial court, manifest or otherwise, that an appellate court can review.'" Id. at 211 (quoting State v. Fraser, 170 Wn. App. 13, 25–26, 282 P.3d 152 (2012)). Therefore, the alleged confrontation error may not be raised for the first time on appeal.

Generally, if a judge makes a definite, final ruling on a motion in limine, then the losing party is deemed to have a standing objection, and further objection is not required to preserve the error. State v. Powell, 126 Wn.2d 244, 256–57, 893 P.2d 615 (1995). When a trial judge reserves the ruling, "'any error in admitting or excluding evidence is waived unless the trial court is given an opportunity to reconsider its ruling.'" Id. at 257 (quoting State v. Carlson, 61 Wn. App. 865, 875, 812 P.2d 536 (1991)). In that instance, the party is required to object again during trial to preserve the issue for appeal. Id. The Washington Supreme Court has found that a hearsay objection was preserved for appeal when the appellant "clearly raised the hearsay argument" in a pretrial motion to exclude evidence "and

gave the trial court an opportunity to address it." In re Det. of Coe, 175 Wn.2d 482, 504, 286 P.3d 29 (2012).

Hatfield included a confrontation objection in his motion to exclude the shell casing, which was denied. The denial was a final ruling, so Hatfield is deemed to have a standing objection to the evidence of the shell casing and was not required to object further to preserve the issue for appeal. Because Hatfield raised the confrontation issue in his pretrial motions, we will address the merits of his argument.

The confrontation clause of the Sixth Amendment bars admission of testimonial statements of a witness who does not appear at trial, unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. Crawford v. Washington, 541 U.S. 36, 54–55, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). Testimonial statements include those that are the functional equivalent of in-court testimony or that "were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 52.

When the out-of-court statements were made to police, the primary purpose of the contact determines whether or not the statements were testimonial. Davis v. Washington, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). Statements are nontestimonial if the "primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency" but testimonial if "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Id. This primary purpose test applies equally

to statements made during formal interrogation and to spontaneous statements, "volunteered testimony[,] or answers to open-ended questions." State v. Reed, 168 Wn. App. 553, 569 n.9, 278 P.3d 203 (2012) (quoting Davis, 547 U.S. at 822 n.1).

Diaz did not appear at trial and was not cross-examined by Hatfield at any point. Although there was no formal interrogation in progress, Diaz volunteered the statement that he had found the shell casing in the basement to officers investigating the robbery and shooting days after it occurred. There was no ongoing emergency at that time, and the statement was testimonial. The trial court's admission of Diaz's out-of-court statement violated Hatfield's constitutional right to confrontation. However, as discussed below, this error was harmless beyond a reasonable doubt.

B. Expert Statement

Hatfield also contends that the court's admission of a non-testifying expert's conclusion that the shell casing was fired from the gun found in Hatfield's vehicle constituted inadmissible hearsay and violated his Sixth Amendment right to confrontation. The State argues that Hatfield elicited the evidence that the testifying expert's conclusion was peer-reviewed during cross-examination, which opened the door to the witness's explanation of the peer review process during redirect examination.

1. Open Door Doctrine

Appellate courts review a trial court's decision to allow evidence under the open door doctrine for abuse of discretion. State v. Fisher, 165 Wn.2d 727, 750, 202 P.3d 937 (2009). A trial court abuses its discretion when "no reasonable

person would have decided the issue as the trial court did." State v. Russell, 125 Wn.2d 24, 78, 882 P.2d 747 (1994).

The State first argues that "[a]ny error in the witness's explanation of [the evidence elicited during cross-examination that the expert's conclusion was peer-reviewed] during re-direct examination was invited by Hatfield when he introduced the topic." The State cites State v. Henderson for the proposition that a party may not set up error at trial and then claim to be entitled to reversal based on that error on appeal. 114 Wn.2d 867, 870, 792 P.2d 514 (1990) (quoting State v. Pam, 101 Wn.2d 507, 511, 680 P.2d 762 (1984), overruled by State v. Olson, 126 Wn.2d 315, 893 P.2d 629 (1995). In Henderson, the defendant sought reversal for instructional error after the court gave jury instructions that the defendant himself had proposed. Id. at 868. If Hatfield were challenging the admission of Coric's first statement about peer review that he elicited on cross-examination, then the invited error doctrine might bar such a challenge. However, because he is challenging the later admission of the peer reviewer's conclusion, the invited error doctrine does not squarely apply.

The State also argues that Hatfield opened the door to the challenged evidence because he first raised the subject on cross-examination. Hatfield argues that the elicited testimony did not support the introduction of hearsay evidence that violated his right to confrontation and that "[t]he open door doctrine is not a free pass to get anything into evidence."

When a party opens up a subject of inquiry on direct or cross-examination, the rules permit cross-examination or redirect examination within the scope of the

new subject matter. State v. Gefeller, 76 Wn.2d 449, 455, 458 P.2d 17 (1969). "To close the door after receiving only a part of the evidence not only leaves the matter suspended in air at a point markedly advantageous to the party who opened the door, but might well limit the proof to half-truths." Id. Evidence offered to explain, clarify, or contradict other evidence is subject to exclusion if it is irrelevant or if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. ER 402; ER 403; Fisher, 165 Wn.2d at 750.

If a party elicits testimony that would otherwise be inadmissible, the party opens the door to relevant rebuttal evidence that would also otherwise be inadmissible, "even if constitutionally protected." State v. Hartzell, 156 Wn. App. 918, 934, 237 P.3d 928 (2010). However, the introduction of admissible evidence does not open the door to rebuttal by way of inadmissible evidence. In this instance, the open door doctrine "must give way to constitutional concerns such as the right to a fair trial." State v. Jones, 144 Wn. App. 284, 298, 183 P.3d 307 (2008). Even if a defendant opens the door "to evidence or examination of a particular subject at trial, the prosecutor is not absolved of her ethical duty to ensure a fair trial by presenting only competent evidence on this subject." Id. (emphasis omitted).

The simple fact elicited by Hatfield that Coric's colleague also analyzed the evidence does not appear to be inadmissible. This detail may have raised a question in the minds of the jury requiring explanation of the Washington State Patrol Crime Lab's peer review policy. Because Hatfield raised this new subject

for the first time on cross-examination, the trial court's decision to allow the State to present evidence about the peer review process in rebuttal does not appear to be an abuse of discretion.

### 2. Scope of Examination

We next consider the scope of permissible evidence to which this statement opened the door.[4] Because the elicited statement appears to be admissible, the State was only permitted to elicit otherwise admissible evidence to explain or clarify this testimony on rebuttal.

The peer review policy itself was likely admissible as rebuttal. However, Hatfield argues that the peer reviewer's conclusion was inadmissible hearsay. The peer reviewer's conclusion was an out-of-court statement admitted for its truth, and therefore constituted hearsay. The State did not argue below, nor does it argue on appeal, that this evidence would have been admissible if Hatfield had not opened the door. Although the elicited testimony opened the door to rebuttal regarding the admissible evidence of the peer review policy, it did not open the door to the inadmissible testimony of the peer reviewer's conclusion. Because the State exceeded the scope of permissible redirect examination, the court abused its discretion in allowing testimony as to the peer reviewer's out-of-court statement

---

[4] The State argues in passing that Hatfield has not preserved his objection to the scope of the State's redirect examination. Because Hatfield lodged a standing objection to the peer review evidence on the grounds that it was beyond the scope of cross-examination, he was not required to object again when the testimony was offered to preserve the issue for appeal. See Powell, 126 Wn.2d at 256–5

### 3. Confrontation Clause

Hatfield also argues that Coric's testimony about the peer reviewer's conclusion violated his constitutional right to confront witnesses against him. An expert comes within the scope of the confrontation clause when he makes a statement of fact that tends to inculpate the accused. State v. Lui, 179 Wn.2d 457, 462, 315 P.3d 493 (2014). A testifying expert may express an opinion based on the technical, nontestimonial work of non-testifying laboratory technicians, but "may not parrot the conclusions" of another non-testifying expert. Id. at 484.

Here, the peer reviewer performed the same analysis as Coric and reached an independent conclusion. This was not a laboratory technician performing a purely technical task. His conclusion that the shell casing was fired by the gun found in Hatfield's vehicle was a statement of fact that tended to inculpate Hatfield. Because he did not testify at trial and was not subject to cross-examination, admitting his conclusion violated Hatfield's right to confrontation.

### C. Harmless Error

The State contends that any error in admitting the out-of-court statements was harmless because "the other evidence that Hatfield was the robber who shot Diaz was overwhelming." Confrontation errors require reversal unless the State demonstrates beyond a reasonable doubt that the error did not contribute to the verdict. State v. Jasper, 174 Wn.2d 96, 117, 271 P.3d 876 (2012). An error in admission of evidence is not of constitutional magnitude and is "not prejudicial unless, within reasonable probabilities, the outcome of the trial would have been

materially affected had the error not occurred." State v. Tharp, 96 Wn.2d 591, 599, 637 P.2d 961 (1981).

In light of the other evidence, especially the video evidence, these errors were harmless beyond a reasonable doubt. The video from the basement security camera shows the gunman's face from multiple angles, including directly facing the camera and in profile. The jury was able to compare these images to the videos of Hatfield during his interview with detectives and during the search of his person after his arrest three weeks later, as well as his appearance in the courtroom. At trial, Brown, another participant in the robbery, identified Hatfield as the gunman during the robbery. Although he had not met the gunman before that night, Brown had substantial opportunity to observe him when driving to the house, in the basement as the robbery occurred, when driving away from the scene, and when dividing up the stolen property. His identification was not challenged on cross-examination.

Boggs, one of the victims of the robbery, also identified Hatfield as the gunman at trial. He had also identified Hatfield's photograph in a photo montage twelve days after the robbery. On the night of the robbery, Boggs had the opportunity to observe the gunman when discussing the drug transaction upstairs and when the robbery was occurring in the basement. Boggs is looking at the gunman for the majority of the video showing a portion of the robbery.

Even if Diaz's statement that he had found the shell casing in the basement and the peer reviewer's conclusion that the shell casing was fired by the gun found in Hatfield's vehicle had been properly excluded, the other evidence of Hatfield's

guilt was overwhelming. The confrontation errors were harmless beyond a reasonable doubt.

V.    Unanimity

Hatfield contends that his right to a unanimous jury verdict was violated in two ways. First, he argues that the State produced insufficient evidence to support one of the alternative means of committing burglary. Second, he argues that the State failed to specify the victim assaulted during the burglary, and the jury should have received a unanimity instruction.

Criminal defendants have the right to a unanimous jury verdict in Washington. Const. art. I, § 21. Because this issue affects a defendant's fundamental constitutional rights, it may be raised for the first time on appeal. State v. Armstrong, 188 Wn.2d 333, 339, 394 P.3d 373 (2017). We review constitutional issues de novo. Id.

A. Means for Committing Burglary

Hatfield contends that the State did not elect to rely on one of the two alternative means for committing burglary, and he was therefore denied his right to a unanimous jury verdict. The State responds that entering and remaining are not alternative means of committing burglary and, even if they were, that there was substantial evidence of both means.

"An alternative means crime is one where the legislature has provided that the State may prove the proscribed criminal conduct in a variety of ways." Id. at 340. Contrary to the State's position, we have consistently treated entering unlawfully and remaining unlawfully as alternative means of committing burglary.

See, e.g., State v. Allen, 127 Wn. App. 125, 110 P.3d 849 (2005); State v. Gonzalez, 133 Wn. App. 236, 148 P.3d 1046 (2006); State v. Sony, 184 Wn. App. 496, 337 P.3d 397 (2014).

Where alternative means of committing a charged crime are alleged and substantial evidence supports both alternative means submitted to the jury, unanimity as to the means is not required. Armstrong, 188 Wn.2d at 340. When "constitutionally sufficient evidence supports both charged alternatives, the lack of jury unanimity does not entail the danger . . . that any of the jury members may have based their finding of guilt on an invalid ground." State v. Whitney, 108 Wn.2d 506, 511, 739 P.2d 1150 (1987). The evidence is constitutionally sufficient if, viewed in the light most favorable to the State, a rational trier of fact would be justified in finding guilt beyond a reasonable doubt. Armstrong, 188 Wn.2d at 341. However, "[w]hen one alternative means of committing a crime has evidentiary support and another does not, courts may not assume the jury relied unanimously on the supported means." State v. Woodlyn, 188 Wn.2d 157, 162, 392 P.3d 1062 (2017).

Although there is no dispute that the State produced sufficient evidence of unlawful remaining, Hatfield contends that the State did not produce sufficient evidence to show that he entered a building unlawfully. The jury was instructed that:

> A person commits the crime of burglary in the first degree when he or she enters or remains unlawfully in a building with intent to commit a crime against a person or property therein, and if, in entering or while in the building or in immediate flight therefrom, that person is armed with a deadly weapon or assaults any person.

The jury was also instructed that "[b]uilding, in addition to its ordinary meaning, includes any dwelling." "[E]ach unit of a building consisting of two or more units separately secured or occupied is a separate building." RCW 9A.04.110(5). "In the situation involving the multi-unit structure, each tenant has a privacy interest in his or her room or apartment, and that interest is separate from the interests of other tenants. Thus, it makes sense to characterize the burglarized rooms as separate 'buildings.'" State v. Thompson, 71 Wn. App. 634, 645, 861 P.2d 492 (1993).

Viewed in the light most favorable to the State, a rational finder of fact could find that Hatfield unlawfully entered a building beyond a reasonable doubt. Boggs testified that he sublet the entire basement of the house to Diaz and his girlfriend. The basement was a separately-occupied dwelling from the upstairs and therefore a separate building. Boggs also testified that guests were not allowed in the basement as a rule, especially when there was a drug transaction going on. On the night of the incident, Boggs testified that he told the three men to wait upstairs while he retrieved the drugs. Because Hatfield did not have permission to enter the basement and the basement was a separate dwelling from the upstairs, sufficient evidence supports the alternative means of unlawful entry. Hatfield's right to a unanimous jury verdict was not violated.

B. Identity of Victim

Hatfield also contends that his right to jury unanimity was violated because the prosecutor did not specify which victim was assaulted during the burglary and the jury did not receive a unanimity instruction as required by State v. Petrich. 101

Wn.2d 566, 572, 683 P.2d 173 (1984), overruled on other grounds by State v. Kitchen, 110 Wn.2d 403, 756 P.2d 105 (1988). The State responds that unanimity was not required as to the person assaulted because there was sufficient evidence that both men were assaulted.

The information charged Hatfield with burglary in the first degree, alleging that "the defendant and another participant in the crime were armed with a deadly weapon and did assault a person, to-wit; Adrien William Diaz and Kevin Dale Boggs." The jury was instructed that, to convict Hatfield of burglary, it must find "[t]hat in so entering or while in the building or in immediate flight from the building the defendant was armed with a deadly weapon or assaulted a person." The State concedes that it did not elect to rely on the assault of only one victim. The court did not instruct the jury that it needed to agree unanimously on which person was assaulted.

Hatfield argues that this is a multiple acts case, while the State contends that this is another alternative means situation. "When the prosecutor presents evidence of several acts which could form the basis of one count charged, either the State must tell the jury which act to rely on in its deliberations or the court must instruct the jury to agree on a specified criminal act." State v. Crane, 116 Wn.2d 315, 325, 804 P.2d 10 (1991), overruled on other grounds by In re Pers. Restraint of Andress, 147 Wn.2d 602, 56 P.3d 981 (2002).

Our decision in State v. Williams is factually similar. 136 Wn. App. 486, 150 P.3d 111 (2007). In Williams, the defendant was charged with burglary in the first degree, and the information alleged that "in the course of the burglary, Williams

assaulted 'a person, to wit: Makeba Otis and Leslie Johnson.'" Id. at 491. The jury was instructed that, to convict Williams of burglary in the first degree, it must find beyond a reasonable doubt "[t]hat in so entering or while in the building or in immediate flight from the building the defendant or an accomplice in the crime charged assaulted a person." Id. at 492 (emphasis omitted). The court did not instruct the jury that it must unanimously agree on the person who Williams assaulted to convict him of the charged crime. Id.

In Williams, we reasoned that "two distinct criminal acts were alleged: the assault against Johnson and the assault against Otis. Either criminal act was sufficient to satisfy the assault element of first degree burglary." Id. at 496–97. We explicitly rejected the State's contention that the two assaults were alternative means of committing the charged crime:

> Under the statute, burglary in the first degree may be committed in two different ways, either by being armed with a deadly weapon, or by assaulting any person. Accordingly, these two modes of commission constitute alternative means by which the crime of burglary may be proved. In contrast, the two assaults alleged in this case constitute only one mode of commission under the statute, i.e. assault.

Id. at 498. Because the State had not specifically elected to rely on one assault, we found that a unanimity instruction was required. Id.

The State argues that Armstrong implicitly abrogates the analysis in Williams. In Armstrong, the defendant was charged with violation of a court order by either assault or two prior convictions for violation of a court order. 188 Wn.2d at 338. Only one victim was alleged. Id. at 336. Although the dissent argued that an "alternative acts" or "alternative crimes" analysis would have been more

appropriate, the majority considered the case to be "a straightforward application" of the alternative means analysis. Id. at 347, 349 (Gordon McCloud, J., dissenting). Therefore, Armstrong does not appear to affect the analysis in Williams.

Under Williams, Hatfield was entitled to a unanimity instruction because the State alleged two distinct criminal acts to support one means of committing first degree burglary.

C. Harmless Error

The Washington Supreme Court clarified the harmless error analysis for lack of unanimity in multiple acts cases in Kitchen:

> [I]n multiple acts cases, when the State fails to elect which incident it relies upon for the conviction or the trial court fails to instruct the jury that all jurors must agree that the same underlying criminal act has been proved beyond a reasonable doubt, the error will be deemed harmless only if no rational trier of fact could have entertained a reasonable doubt that each incident established the crime beyond a reasonable doubt.

110 Wn.2d at 405–06. Because this is constitutional error, the error is presumed prejudicial and the conviction will not be upheld unless it is harmless beyond a reasonable doubt. Id. at 411–12.

The jury was instructed that:

> An assault is an intentional touching or striking or shooting of another person that is harmful or offensive regardless of whether any physical injury is done to the person.
> An assault is also an act done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury.

Hatfield concedes that there was no reasonable doubt that Diaz was assaulted because he was shot. However, he argues that the evidence does not show that

- 35 -

Boggs was assaulted beyond a reasonable doubt. Hatfield concedes that "[t]he video shows the man with the gun made brief physical contact with Boggs" and "pick[ed] up a pillow and put the gun in it at one point" but argues that this is insufficient to show that Boggs was assaulted. The evidence does not support this characterization of the encounter. The video showed that the gunman made intentional physical contact with Boggs, shoving him three times. This contact was offensive in its own right, but particularly so because the assailant was holding a gun at the time.

The video also shows the gunman intentionally putting a pillow over the muzzle of the gun, presumably to convey an intent to silence a shot. Boggs testified that he believed he was going to be shot when the gunman covered the muzzle of the gun with the pillow and that he was panicking. This fear was reasonable given the fact that he was being robbed. The evidence established that Boggs was assaulted beyond a reasonable doubt, and no rational tier of fact could have concluded otherwise. The error was harmless.

VI. Eighth Amendment

In a supplemental assignment of error, Hatfield contends that his sentence constituted cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution and Article I, Section 14 of the Washington State Constitution because his life sentence under the Persistent Offender Accountability Act (POAA)[5] was based in part on a strike offense committed when he was a youthful adult. Hatfield argues that the sentencing court should have

_____

[5] Chapter 9.94A.570 RCW.

- 36 -

been given discretion to consider the characteristics of youth that persist when a defendant is 24 years old, as Hatfield was at the time he committed his first strike offense, when deciding whether to impose a life sentence. Appellate courts consider constitutional challenges to sentencing de novo. State v. Cubias, 155 Wn.2d 549, 552, 120 P.3d 929 (2005).

The Washington State Supreme Court considered this precise issue very recently in State v. Moretti. 193 Wn.2d 809, 446 P.3d 609, 613 (2019). The three consolidated cases "each ask[ed] whether it is constitutional to apply the POAA to people who were in their 30s or 40s when they committed their third strike but were young adults when they committed their first strike." Id. at 814. The defendants in Moretti were 19 to 20 years old when they committed their first strike offenses. Id. at 814–15, 817. The court held that Article I, Section 14 of the Washington Constitution did not forbid mandatory sentences of life without the possibility of parole under the POAA in this circumstance. Id. at 818–19. Because Article I, Section 14 offers greater protection to recidivists and juveniles than the federal constitution, the court did not reach the petitioners' argument that the punishment was cruel and unusual under the Eighth Amendment to the United States Constitution. Id. at 819.

Hatfield committed his first strike offense when he was 24 years old and committed the offenses at issue in this case when he was in his 50s. Although Hatfield was a youthful adult when he committed his first strike offense, Moretti makes clear that the imposition of a life sentence under the POAA was constitutional.

VII.    Cumulative Error

Hatfield contends that the cumulative effect of the errors alleged above deprived him of his constitutional right to a fair trial. "The accumulation of errors may deny the defendant a fair trial and therefore warrant reversal even where each error standing alone would not." State v. Davis, 175 Wn.2d 287, 345, 290 P.3d 43 (2012), abrogated on other grounds by State v. Gregory, 192 Wn.2d 1, 427 P.3d 621 (2018). However, when there is overwhelming evidence of the defendant's guilt, cumulative errors do not require reversal. In re Pers. Restraint of Cross, 180 Wn.2d 664, 691, 327 P.3d 660 (2014), abrogated on other grounds by Gregory, 192 Wn.2d 1 (2018). A defendant has the right to a fair trial, not a perfect one. In re Pers. Restraint of Elmore, 162 Wn.2d 236, 267, 172 P.3d 335 (2007).

Although a number of errors occurred in this case, Hatfield was not denied his right to a fair trial. The evidence of Hatfield's guilt was overwhelming, as described above, and reversal is not required.

VIII.   Statement of Additional Grounds

Hatfield assigns error to a number of evidentiary rulings in his statements of additional grounds for review. He also contends that his trial counsel's failure to object to certain challenged statements constituted ineffective assistance and that the circumstances surrounding Dillenburg's testimony infringed on his rights.

A. Admission of 911 Call

Hatfield contends that the statements made to the dispatcher in the 911 call constituted inadmissible hearsay and violated his right to confrontation.

Hatfield lodged a general pretrial objection to exclude out-of-court statements on hearsay and confrontation grounds. The State identified the 911 call as evidence that it intended to offer on the theory that the statements fell into the exceptions to the hearsay rule for excited utterances and present sense impressions. At that point, Hatfield moved to exclude Diaz and the other residents of the house as witnesses. The court reserved ruling on both the motion to exclude the witnesses and the objection to out-of-court statements. During Boggs' testimony, the State moved to admit the recording of the 911 call. Hatfield stated that he had no objection. The court granted the State's motion to publish the exhibit to the jury, and the State played the recording in open court.

As stated above, when a trial judge rules that further objections at trial are required or makes a tentative ruling on a motion in limine, such as reserving the ruling, "any error in admitting or excluding evidence is waived unless the trial court is given an opportunity to reconsider its ruling." Powell, 126 Wn.2d at 256–57 (quoting Carlson, 61 Wn. App. at 875). In that instance, the party is required to object again during trial to preserve the issue for appeal. Id. at 257. Because the court reserved ruling on this issue and Hatfield voiced no objection when the evidence was offered, he has not preserved his objection for review. Also, Hatfield may not assert a confrontation challenge to these statements for the first time on appeal. See Burns, 193 Wn.2d at 210–11.

B. Ineffective Assistance of Counsel

Hatfield also contends that his trial counsel provided ineffective assistance when he failed to object to the 911 call on hearsay and confrontation grounds.

Again, as explained above, matters that can be characterized as legitimate trial strategy or tactics do not constitute deficient performance. Kyllo, 166 Wn.2d at 863. "The decision of when or whether to object is a classic example of trial tactics. Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal." State v. Madison, 53 Wn. App. 754, 763, 770 P.2d 662 (1989). The failure to object was not an egregious error and the challenged statements were not central to the State's case. Because Hatfield cannot show that his counsel's performance was deficient, his claim of ineffective assistance fails.

C. Dillenburg Statements

Hatfield contends that the court erred in admitting Brown's testimony regarding Dillenburg's out-of-court statements under the co-conspirator exception to the rule against hearsay. He argues that this rule "specifically applies only to conspiracy [cases] and [co-conspirators], not [cases] prosecuted under a theory of accomplice liability where a co-defendant classified as an accomplice [refuses] to testify."

At trial, the State asked Brown about Dillenburg's statements made while the three men were driving to the house before the robbery and away from the house afterward. Hatfield objected on hearsay grounds, and the State responded that the co-conspirator exception applied because they were statements made in furtherance of a conspiracy. The court overruled the objections.

A statement by a co-conspirator of a party during the course and in furtherance of a conspiracy is not hearsay if offered against the party. ER

801(d)(2)(v). The co-conspirator exception to the hearsay rule applies even if the crime of conspiracy is not charged. State v. Dictado, 102 Wn.2d 277, 282–83, 687 P.2d 172 (1984).

On this issue, Hatfield's argument is clear: the co-conspirator exception did not apply because he was not charged with conspiracy. Washington case law indicates otherwise. The court did not err in admitting the evidence.

D. Dillenburg Testimony

Finally, Hatfield contends that "[i]t is reversible error to permit the prosecution to ask suggestive question[s] to the defendant's accomplice to provoke the accomplice to claim his privilege against self-incrimination in the presence of the jury." Although Hatfield clearly takes exception to the circumstances surrounding Dillenburg's refusal to testify, the grounds for his objection are unclear. He mentions misconduct, the right to confrontation, the right to due process, and ER 613 as possible bases for reversal.

Hatfield's contention that "the prosecutor knew that Dillenburg probably was not going to testify [because] Dillenburg wanted to renegotiate the deal that he struck with the State" and called him as a witness to provoke him to claim his privilege against self-incrimination in the presence of the jury is not supported by the record before this court. If Hatfield "wishes a reviewing court to consider matters outside the record, a personal restraint petition is the appropriate vehicle for bringing those matters before the court." McFarland, 127 Wn.2d at 338.

Because Hatfield does not adequately inform the court of the alleged errors stemming from Dillenburg's refusal to testify, we decline to consider this issue. See RAP 10.10(c).

Affirmed.

WE CONCUR: